## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JERRY M. ADAIR, CARLA DANIELSON, KATHERINE J. EMRICK, PRESTON PHAM, and EVA D. RECCHIA, individually and on behalf of all others similarly situated, | Civil Action No. 25-2384 |
| *Plaintiffs,* | |
| v. | |
| CIGNA CORPORATE SERVICES, LLC, and THE CIGNA GROUP, | |
| *Defendants.* | |

## <u>CLASS ACTION COMPLAINT</u>

1.     Plaintiffs Jerry M. Adair, Carla Danielson, Katherine J. Emrick, Preston Pham, and Eva D. Recchia ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this class action lawsuit against defendant Cigna Corporate Services, LLC ("CCS") and defendant The Cigna Group ("Cigna") for violations of the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa.C.S. §§ 5701–5782 ("WESCA"), invasion of privacy, breach of fiduciary duty, and unjust enrichment under Pennsylvania common law. Plaintiffs allege the following facts based upon personal knowledge, investigation by counsel, and information and belief.

2.     Cigna – a multibillion-dollar health insurance conglomerate – wiretapped its own insureds along with its agent and subsidiary, CCS, in an invasive betrayal of digital trust. Plaintiffs used Defendants' website to query

highly sensitive health issues, only to have every query recorded in real time by hidden tools embedded on the website. There was neither informed consent nor an opportunity to opt out – only tracking that started the second that Plaintiffs loaded the website on their browsers. Defendants made a choice to trade insureds' privacy for corporate profit, to treat Plaintiffs' most sensitive interactions as marketing fodder, and to exploit their data under the guise of servicing health benefits. Plaintiffs seek damages and injunctive relief to redress Defendants' unlawful interception and misuse of this data.

## NATURE OF THE CASE

3.      This action challenges Defendants' practice of surreptitiously intercepting and misusing personal, and highly sensitive, health-related information from the www.cigna.com website (together with subpages, "Defendants' Website" or "Website").

4.      Defendants have violated, and continue to violate, WESCA and Pennsylvania common law by wiretapping the electronic health-related communications of Plaintiffs and other users of Defendants' Website.

5.      Defendants' violations occur as follows: Entirely unbeknownst to site users – third-party vendors, including Pinterest, Snapchat, The Trade Desk, LiveRamp, Demandbase, MediaMath, and Meta ("Third-Party Vendors"), have supplied tracking technologies ("Tracking Pixels" and "Session Replay Code") to Defendants, which Defendants have embedded on their Website.

6.      This code is embedded on Defendants' Website for the purpose of covertly tracking, intercepting, and recording Website users' communications with

Defendants, including users' mouse movements, clicks, keystrokes (such as text entered into a search box or information box), web addresses (i.e., "URLs") of individual pages visited, and/or other electronic communications in real time ("Website Communications").

7.    After surreptitiously intercepting and capturing the Website Communications of users of the Website, Defendants and the Third-Party Vendors use these Website Communications for various purposes that benefit and enrich themselves.

8.    The Third-Party Vendors use the harvested personal health-related information to create and/or bolster advertising profiles of Website users, to target advertisements to users, and/or to sell information about Website users to other entities for commercial gain.

9.    Defendants use the harvested information to track visits to the Website, allowing them to covertly recreate Website users' entire sessions on Defendants' Website. Defendants can do this because the embedded code creates a replay of users' behavior on the Website and provides it to Defendants for analysis.

10.    This collection of Website users' highly sensitive, private data takes place without notice to or consent from users of Defendants' Website.

11.    Defendants facilitate the collection of this highly sensitive, private data by embedding the code of tracking technologies, such as Tracking Pixels, on the Website. The embedded code then collects and sends data to the Third-Party Vendors.

12.     Defendants thereby permit the Third-Party Vendors to intercept Website users' private healthcare data.

13.     Defendants also benefit financially by obtaining and analyzing data that enables them to add new customers, replacing the need for (and costs associated with) advertising and surreptitiously finding targets for advertising campaigns. These commercial advantages come at the expense of insureds' privacy and contradict Defendants' promises to safeguard health-related information and legal duty to do the same.

14.     Defendants' violations have broad-ranging deleterious effects, including because Defendants hold highly sensitive personal, health-related data. This data includes private medical and health information, as well as related unique personal identifiers, financial details, and other data provided by Website users related to or for the purpose of obtaining healthcare. This highly sensitive personal, health-related data requires robust privacy protections to ensure compliance with federal privacy laws.

15.     Cigna is a covered entity under the Health Insurance Portability and Accountability Act ("HIPAA"), 42 U.S.C. § 1320d et seq. CCS is a "business associate" of Cigna under HIPAA and its regulations, *see* 45 C.F.R. § 160.103, because CCS creates, receives, maintains, and transmits protected health information ("PHI") on behalf of Cigna and covered entities within Cigna.

16.     Under HIPAA, a "business associate" also must comply with HIPAA privacy and security rules with respect to PHI. *See* 45 C.F.R. §§ 164.302–316;

4

164.500–534. Business associates are required to implement administrative, technical, and physical safeguards to protect the confidentiality, integrity, and availability of PHI. 45 C.F.R. § 164.306. Business associates are prohibited from using or disclosing PHI except as permitted by business associate agreements or as required by law. *See* 45 C.F.R. §§ 164.502(a)(3); 164.504(e).

17.     Disclosure of PHI for marketing or analytics purposes – such as to data brokers or advertising networks – is expressly prohibited absent valid, written authorization. *See* 45 C.F.R. § 164.508(a)(3) ("a covered entity must obtain an authorization for any use or disclosure of protected health information for marketing"); *id.* § 164.508(c)(1)(vi).

18.     Defendants act as fiduciaries with respect to the sensitive data that they collect and manage on behalf of Plaintiffs. By designing, operating, and maintaining the Website through which Plaintiffs access password-protected health benefit information, Defendants assume the responsibility and duty to safeguard that data and use them solely for authorized, health-related purposes. This fiduciary duty includes a duty of loyalty and care, requiring Defendants to refrain from exploiting Plaintiffs' data for commercial benefit or disclosing data to third-parties like the Third-Party Vendors without clear, informed, and *express* consent.

19.     As a result of Defendants' violations and invasions of the privacy rights of Website users, Cigna's insureds, including Plaintiffs, have suffered significant harms, including but not limited to a loss of privacy, embarrassment, and greatly

increased vulnerability to identity theft and fraud, as well as having their confidential financial information used for the benefit of Defendants and others.

20.    Plaintiffs bring this action individually and on behalf of a class of all insureds of Cigna whose Website Communications were wiretapped and intercepted via the code embedded on Defendants' Website.

21.    Plaintiffs seek all civil remedies provided under the alleged causes of action, including but not limited to compensatory, statutory, treble, and/or punitive damages, and attorneys' fees and costs.

<u>**PARTIES**</u>

**A.    Plaintiffs and Use of Website**

22.    Plaintiff Jerry M. Adair is a resident of Astoria in Queens County, New York. He has been insured under a health policy of Cigna through his employer, the Walt Disney Company, for the past seven years. During the relevant time periods, he routinely used the Defendants' Website to review covered procedures, download copies of his insurance card to present to medical providers, and check policy limits, copays, and deductibles.

23.    Plaintiff Carla Danielson is a resident of South St. Paul in Dakota County, Minnesota. She has been insured under a health policy of Cigna through her employer, Aegis Science, for approximately the past seven years. She used and continues to use the Defendants' Website regularly.

24.    Plaintiff Katherine J. Emrick is a resident of Dayton in Montgomery County, Ohio. She was insured under a health policy of Cigna during the relevant time periods and remains insured under Cigna's dental and vision policies. She had

health insurance through ARCTOS, her employer, and has used Defendants' Website on multiple occasions.

25.    Plaintiff Preston Pham is a resident of San Jose in Santa Clara County, California. He was insured under a health policy of Cigna during the relevant time periods through his employer, Applied Materials. He has used Defendants' Website on numerous occasions.

26.    Plaintiff Eva D. Recchia is a resident of Chicopee in Hampden County, Massachusetts. She was insured under health and dental policies of Cigna through her employer, Cartamundi East Longmeadow, LLC, until December 31, 2024. During the relevant time periods, she frequently used the Defendants' Website.

### B.    Defendants Cigna and Cigna Corporate Services, LLC

27.    Defendant CCS is a wholly owned subsidiary of one of the nation's largest health services and health insurance providers, Cigna. CCS is incorporated in Delaware and has its principal place of business in Philadelphia, Pennsylvania.

28.    Defendant Cigna is a global health services company incorporated in Delaware and based in Connecticut. Cigna provides a range of health-related services, including health insurance plans, dental, and vision insurance to its insureds, including Plaintiffs.

29.    CCS functions as an operating affiliate within Cigna's corporate structure and administers the digital infrastructure used by insureds of Cigna, including Plaintiffs, to access health plan information.

30.    CCS operates and maintains the Cigna-branded Website, www.cigna.com, which, among other things, is a portal through which insureds

(including Plaintiffs) research and seek advice on highly sensitive health issues, manage health benefits, verify doctors, and access information about their personal healthcare coverage. Defendants' Website services a range of health-related businesses, including health, dental, and vision businesses, on behalf of Cigna, and for the use of insureds of Cigna, including Plaintiffs.

31.     Cigna reportedly earned revenues of approximately $180 billion in 2022 and approximately $195.3 billion in 2023,[1] reflecting its significant presence in the health insurance market.

32.     As a privately held subsidiary within Cigna's corporate structure, CCS does not publicly disclose its own revenue figures.

33.     CCS and Cigna are both "person[s]" under the definition provided in WESCA. 18 Pa.C.S. § 5702.

**C.     Cigna's Principal Liability for the Acts of its Agent, Cigna Corporate Services, LLC**

34.     Cigna's disclosures[2] with the U.S. Securities and Exchange Commission ("SEC") confirm that Cigna directly controls digital strategy and investments, including "customer engagement," and further confirm that Cigna integrates and governs all digital operations (including CCS) and develops and oversees AI and analytics tools:

---

[1] Denise Myshko, *Cigna's 2023 Revenue Grew 8% to $195.3 Billion*, Managed Healthcare Executive (Feb. 2, 2024), https://www.managedhealthcareexecutive.com/view/cigna-s-2023-revenue-grew-8-to-195-3-billion [https://perma.cc/2FS3-DG6M].

[2] *See* The Cigna Group, *Annual Report (Form 10-K)*, at 15 (filed on December 31, 2023), https://s202.q4cdn.com/757723766/files/doc_financials/2023/q4/ci-20231231.pdf [https://perma.cc/5KQS-MAXS].

**DIGITAL, DATA AND TECHNOLOGY**

The Cigna Group's investments in digital, data and technology are focused on cultivating robust digital-first capabilities to better engage with customers and stakeholders. We deliver value for our clients, customers and other stakeholders by creating better health outcomes, improving customer experience and lowering total cost of care.

*Innovation.* Customer-centric, digital-first, virtual-led vision for health care remains at the forefront of our priorities. The advancement of our internal innovative capabilities and strategic partnerships continues to produce new and more effective ways to engage with our customers to help close gaps in care, optimize treatment and improve outcomes. During 2023, the Technology team continued to deliver value for current business while simultaneously focusing on reducing complexity and cost within our technology ecosystem. As we continue to simplify our technology ecosystem, we expect an increase in digital advancements, customer engagement, loyalty and speed to market.

In 2023, the Cigna Group continued to invest in our technology capabilities to produce new and more effective ways to operate, as well as meet customers where they are. We intend to lead with digital engagement by creating connections between points of care and guiding customers through the best mechanism to the optimal location and provider. Our modernized data and technology ecosystem will enable us to integrate our assets, gather insights and engage with prospects and customers in new ways. For the year ended December 31, 2023, our capital expenditures for property, equipment and computer software were $1.6 billion.

The Cigna Group continued to transform and improve the way health care is delivered through automation, advanced analytics and Artificial Intelligence ("AI") technologies. We utilize these technologies today to analyze data and uncover patterns and insights to help improve outcomes, increase connectivity between the patient and the health care system, speed up administrative processes, and improve the overall member experience.

The Cigna Group continued to accelerate the pace of development and innovation through our new AI Center of Enablement ("COE"). Our AI COE focuses on Generative AI ("Gen AI"), and assesses and governs guardrails, systemic controls, and processes to provide oversight to ensure the responsible use of Gen AI practices. These commitments are intended to ensure our Gen AI capabilities and

35.     CCS, in contrast, has almost no independent online presence. Even its LinkedIn profile is unclaimed (with virtually no employees listed as working there), and there is no webpage that describes its services or role within Cigna's corporate structure.

36.     Despite the lack of public-facing information about CCS, the digital services it provides fall wholly within Cigna's responsibilities, including as disclosed to the SEC. This is because CCS performs back-end administrative and technical functions for Cigna and executes Cigna's digital strategy, with Cigna as its principal.

37.     Under Pennsylvania law, a principal-agent relationship exists when one party acts on behalf of and under the control of another. Because Cigna dictates digital and data strategy and presents all services on Defendants' website under its own name, and because CCS performs digital and administrative functions at

Cigna's direction and without autonomy, the two entities are in a textbook principal-agent relationship.

38.    CCS acts with actual authority from Cigna to operate the Website, which includes authority over everything from how users navigate the Website, what information is available, how data is collected, and what Third-Party Vendor code is embedded on the Website.

39.    CCS advances Cigna's goals, including but not limited to gathering valuable data about Plaintiffs' interactions with the Website, which benefits Cigna by providing Cigna with data in a competitive insurance marketplace and additional revenue.

40.    Cigna retains the exclusive right to control the Website, including the right to make decisions about what data gets collected, how that data is used, and how tracking technologies are implemented.

41.    At all relevant times, Cigna directed and controlled the operations of CCS, particularly its work on the Website that served as the online platform for engagement with Cigna's insureds, including Plaintiffs.

42.    As such, Cigna is legally responsible for CCS's conduct under Pennsylvania agency law, including all of the conduct at issue in this action, and is directly responsible itself, independent of its role as the principal, for these acts.

## JURISDICTION

43.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action in which the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest

and costs; there are 100 or more members of the proposed class; and at least one member of the proposed class, including Plaintiffs, is a citizen of a state different than Defendants.

44.    Defendants' Website includes a Terms of Use section that provides:

These Terms of Use apply to the operations of the Cigna Healthcare[SM] website on which they are posted (the **"Site"**). These Terms of Use are between a user of any portion of the Site (**"you"** or **"your"**) and, unless otherwise specified in the Site Specific Terms, Cigna Corporate Services, LLC (**"we"**, **"us"** or **"our"**).[3]

45.    The Terms of Use form an agreement between Website users, including Plaintiffs, and Defendants.

46.    Plaintiffs used the Website and therefore accepted these Terms of Use and entered into a direct agreement with Defendants.

47.    Defendants have consented to personal jurisdiction in the Eastern District of Pennsylvania as part of their Terms of Use:

Any dispute, claim, action or proceeding arising out of or related to the Site, the Site Content, the Privacy Notice, the Site Specific Terms, or these Terms of Use, or the interpretation or enforcement hereof, whether at law or in equity, shall be brought only in the state courts located in Philadelphia, Pennsylvania, U.S.A. or, if proper and exclusive federal subject matter jurisdiction exists, the United States District Court for the Eastern District of Pennsylvania.

48.    By using Defendants' Website and services, insureds (including Plaintiffs) agreed to this clause, thereby submitting to jurisdiction in this District for any legal disputes.

49.    This is commonly known as a "forum selection clause."

---

[3] *Terms of Use, Cigna Healthcare*, Cigna Healthcare (Mar. 28, 2024), https://www.cigna.com/legal/compliance/terms-of-use [https://perma.cc/5LY4-RCYH].

50.    The forum selection clause designating this District as the venue for its legal disputes is not unreasonable because both Defendants expect to resolve disputes in this District and have a significant presence in this District, and CCS has its corporate headquarters in Philadelphia.

51.    As a disclosed principal, Cigna is also subject to the terms of agreements entered into by CCS within the scope of its agency. CCS executed the Terms of Use on Cigna's behalf.

52.    Jurisdiction in this District is neither arbitrary nor inconvenient for Defendants, as it is where they both conduct substantial business.

53.    Defendants have consented to jurisdiction in this Court via the Terms of Use published on Defendants' Website, which state that Defendants submit to the personal jurisdiction of this Court and consent to the exclusive venue of this Court, waiving any objections thereto.

54.    Cigna has consented to jurisdiction in this Court because it is held to the agreements made by its agent, CCS, while acting on Cigna's behalf.

## GOVERNING LAW

### A.    The Terms of Use Establish That Pennsylvania Law Governs

55.    The Terms of Use also includes a "Governing Law" section that expressly provides that, "These Terms of Use and the Site Specific Terms shall be governed by and construed in accordance with the laws of the state of Pennsylvania, U.S.A., excluding its conflict of laws rules."[4]

---

[4] *Id.*

56.    Through this provision, Defendants made a deliberate and express choice to subject their Website-related conduct to the substantive laws of the state of Pennsylvania.

57.    This provision establishes that Pennsylvania law governs the interpretation and enforcement of Defendants' Website, including disputes arising from Defendants' online representations, disclosures, and data-related practices.

58.    The Terms of Use further state that, "The Site is intended for use by individuals residing in the United States of America."

59.    As shown in its express statement that the Website is intended for use by residents of the United States, Defendants anticipated and intended that individuals residing in all fifty states, including Plaintiffs' states, would access the Website.

60.    Defendants' selection of Pennsylvania governing law, along with its expressly recognized nationwide user base, demonstrates that Defendants intended their online conduct to have legal effect throughout the United States, with residents of other states availing themselves of Pennsylvania law to challenge Defendants' Website-related conduct.

61.    Accordingly, Pennsylvania laws govern disputes arising from the use of Defendants' Website, such as those giving rise to the claims asserted by Plaintiffs.

**B.    The Pennsylvania Wiretapping and Electronic Surveillance Control Act (WESCA)**

62.    WESCA was enacted in 1978 by the Pennsylvania General Assembly.[5]

63.    The law was introduced as a state-level version of the federal Wiretap Act (part of the Omnibus Crime Control and Safe Streets Act of 1968).[6] .

64.    WESCA's main purpose was to address and control the growing uses of wiretapping and electronic surveillance by both government authorities and private individuals.

65.    WESCA regulates, and provides limitations on, the interception of communications in Pennsylvania to protect individuals from unwarranted invasions of privacy.

66.    WESCA provides a civil cause of action to "[a]ny person whose wire, electronic or oral communication is intercepted, disclosed, or used in violation of [the statute]" against "any person who intercepts, discloses or uses or procures any other person to intercept, disclose or use, such communication[.]"[7]

67.    WESCA "operates in conjunction with and as a supplement to the Federal Wiretap Act, 18 U.S.C. § 2510 et seq., which provides uniform minimum protections for wire, electronic, or oral communications."[8]

68.    The Federal Wiretap Act allows states to "grant greater, but not lesser, protection than that available under federal law."[9]

---

[5] *Title 18 Chapter 57: Wiretapping and Electronic Surveillance*, Pennsylvania General Assembly, https://www.legis.state.pa.us/cfdocs/legis/LI/consCheck.cfm?txtType=HTM&ttl=18&div=0&chpt=57 [https://perma.cc/TBJ6-8HG9].

[6] *Title III of The Omnibus Crime Control and Safe Streets Act of 1968 (Wiretap Act)*, Bureau of Justice Assistance, https://bja.ojp.gov/program/it/privacy-civil-liberties/authorities/statutes/1284 [https://perma.cc/7ERU-T9GT].

[7] 18 Pa.C.S. § 5725(a).

[8] *Popa v. Harriet Carter Gifts, Inc.*, 52 F.4th 121, 125-26 (3d Cir. 2022).

[9] *Commonwealth v. Spangler*, 570 Pa. 226, 232, 809 A.2d 234, 237 (2002).

14

69.    WESCA "emphasizes the protection of privacy," and "[b]ecause of this privacy concern, the provisions of [WESCA] are strictly construed."[10]

70.    WESCA contains a consent exception, meaning it is not unlawful for someone to "intercept a wire, electronic or oral communication, where all parties to the communication have given prior consent to such interception."[11]

71.    This exception requires "all parties – not just *a* party – to consent to that interception."[12]

72.    WESCA defines "contents" as used with respect to any wire, electronic or oral communication, as "any information concerning the substance, purport, or meaning of that communication."[13]

73.    WESCA defines "electronic communication" as "[a]ny transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system," with the exception of "[a]ny wire or oral communication[,]" "[a]ny communication made through a tone-only paging device[,]" or "[a]ny communication from a tracking device (as defined in this section)."[14]

74.    WESCA defines "electronic, mechanical or other device" as:

Any device or apparatus, including, but not limited to, an induction coil or a telecommunication identification interception device, that can be used to intercept a wire, electronic or oral communication other than: (1) Any telephone or telegraph instrument, equipment or facility, or any component thereof, furnished to the subscriber or user by a provider of

---

[10] *Id.*
[11] 18 Pa.C.S. § 5704(4).
[12] *Popa*, 52 F.4th at 133 (emphasis original).
[13] 18 Pa.C.S. § 5702.
[14] *Id.*

wire or electronic communication service in the ordinary course of its business, or furnished by such subscriber or user for connection to the facilities of such service and used in the ordinary course of its business, or being used by a communication common carrier in the ordinary course of its business, or by an investigative or law enforcement officer in the ordinary course of his duties. (2) A hearing aid or similar device being used to correct subnormal hearing to not better than normal. (3) Equipment or devices used to conduct interceptions under section 5704(15) (relating to exceptions to prohibition of interception and disclosure of communications).[15]

75.    WESCA defines "person" as "[a]ny employee, or agent of the United States or any state or political subdivision thereof, and any individual, partnership, association, joint stock company, trust or corporation."[16]

76.    WESCA defines "user" as "[a]ny person or entity who: (1) uses an electronic communication service; and (2) is duly authorized by the provider of the service to engage in the use."[17]

## FACTUAL ALLEGATIONS

**I.  How Websites Can Use Code to Harvest Users' Private Information**

**A.    Websites Can Be Used to Harvest Personal Data from Users**

77.    Web browsers are software applications that allow users to navigate the Internet and view and exchange electronic information and communications.

78.    Each "device" (such as a computer, tablet, or smart phone) accesses web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

---

[15] *Id.*
[16] *Id.*
[17] *Id.*

79.    Websites are hosted on servers, which are computers that store the site's data and facilitate the exchange of information between the website and the users' browsers.

80.    An HTTP request is a message sent from a web browser to a website's server to ask for information, such as loading a webpage or submitting a query.

81.    An HTTP response is the message that a website's server sends in response to an HTTP request to the browser. It includes the requested information.

82.    Web interactions involve HTTP requests and HTTP responses, with each browsing session typically involving thousands of these exchanges.

83.    When a user visits a website, the website sends a small amount of data, known as a "cookie," to be stored on the user's browser.

84.    Cookies are then stored locally on the user's browser and included with future requests to the same server.

85.    Cookies are used to "remember" users between sessions, including how users interact with the website.

86.    When users log into a website and it "remembers" them, it is often because of a cookie.

87.    Because of the data and privacy concerns associated with cookies, many legal jurisdictions regulate their use. For example, California's Consumer Privacy Act requires businesses to disclose the use of cookies, and the European Union's General Data Protection Regulation mandates user consent before cookies are placed on devices.

88.    When a user visits a website, the browser sends an HTTP request to the server, requesting specific information – for example, the "Select a type of coverage" menu on Defendants' Website.

89.    The server responds with an HTTP response, which includes the requested data in the form of "markup."

90.    This markup is the underlying structure for what the user sees on the webpage, such as text, images, and interactive elements.

91.    Websites are built using this markup and "source code," which provides instructions to the browser, dictating how the page behaves when it loads or when a particular action occurs.

92.    Source code may be written to include instructions to send data to third parties via background HTTP requests, also known as "GET requests."

93.    Users may be unaware that data are being sent to third parties via GET requests.

94.    GET requests can be designed to function like a digital wiretap, capturing and transmitting communications, and facilitating the covert harvesting of consumer data.

### B.    Tracking Pixels and Session Replay Code Can Be Used to Extract Individuals' Private Information

95.    Tracking Pixels include a broad range of HTML and JavaScript code embedded in websites and emails.[18]

---

[18] *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking*, FTC (Mar. 16, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking [https://perma.cc/Y8TJ-53FD].

96.    Tracking Pixels are hidden from sight and trigger a GET request to the tracking entity's remote server.

97.    By triggering this GET request, Tracking Pixels can track, collect, and send to third parties various private and/or personal data, such as how a user interacts with the website or information typed into text fields.[19]

98.    Because Tracking Pixels embedded into websites such as Defendants' Website operate silently in the background, users often do not realize that their private and personal data are being collected as they browse the website.[20]

99.    Tracking Pixels may collect various types of information, including sensitive information and less sensitive information.

100.    Some Tracking Pixels harvest data regarding website users' entertainment or shopping habits and preferences.

101.    In this case, the Tracking Pixels embedded on Defendants' Website do not merely collect shopping trends or similar commercial data; instead, Defendants' Tracking Pixels collect highly sensitive, personal health-related information.

102.    Traditional methods of preventing web-browsing data from being collected, such as blocking third-party cookies, may not prevent Tracking Pixels from collecting user data. As a result, users may have no effective way to block the collection of their private information by Tracking Pixels.[21]

---

[19] *Id.*
[20] *Id.*
[21] *Id.*

103.    While some Tracking Pixel providers claim that they attempt to remove personal information from the data they collect, these efforts are not always successful.

104.    For example, the FTC has said that methods such as "hashing" personal information to scramble it may be inadequate because hashes can be reversed or used to link data across different databases.[22]

105.    Session Replay Code operates similarly to Tracking Pixels, often relying on GET requests to transmit recorded interaction data.

106.    However, Session Reply Code extracts even more intrusive detail about users' browsing behavior.

107.    Specifically, Session Replay Code logs and tracks *everything* a user does on a webpage, including mouse movements, clicks, scrolls, and taps, and can actually track every single key stroke, creating a *complete* reproduction of the user's visit to the website.[23]

## II. Confidential Personal Heath Data Covertly Obtained from Websites Presents Serious Privacy Risks

108.    Data pertaining to individuals are so valuable they have been compared to the "new oil."[24]

---

[22] *Id.*; Ed Felten, *Does Hashing Make Data "Anonymous"?*, FTC (Apr. 22, 2012), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2012/04/does-hashing-make-data-anonymous [https://perma.cc/5UMN-UZR4].
[23] *The definitive guide to session replay*, Fullstory (Oct. 8, 2024), https://www.fullstory.com/blog/session-replay/ [https://perma.cc/56WH-8GQ5].
[24] *The world's most valuable resource is no longer oil, but data*, The Economist (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data [https://perma.cc/US3V-CPCU].

109.    However, the market for such data, and in particular personal health-related data, presents serious privacy risks.

110.    For this reason, Time Magazine has pointed out that the health data market, while highly lucrative, poses a significant risk to individuals' privacy.[25]

111.    Nevertheless, the enormous value of personal health data incentivizes businesses to use invasive tracking technologies on their websites to collect this data from website users.

112.    For example, the data collected by Tracking Pixels is valuable to businesses because they can use it to track Internet users and target ads based on prior browsing behavior.[26] This practice can be highly lucrative.

113.    As one report explained, "There's a whole market of brokers who compile the [personal health] data from providers and other health-care organizations and sell it to buyers."[27]

114.    According to a report from cybersecurity company Feroot Security, "medical-related websites continue to be mined for data including personal medical information[.]"[28]

---

[25] Adam Tanner, *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry*, TIME (Jan. 9, 2017, 9:00 AM), https://time.com/4588104/medical-data-industry/ [https://perma.cc/F3WR-HHVL].
[26] *Id.*
[27] Christina Farr, *Hospital Execs Say They are Getting Flooded with Requests for Your Health Data*, CNBC (Dec. 18, 2019, 8:27 AM), https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html [https://perma.cc/D7CL-N3HX].
[28] *Private Health Data Still Being Exposed to Big Tech, Report Says*, Insurance Journal (Oct. 17, 2023), https://www.insurancejournal.com/news/national/2023/10/17/744625.htm [https://perma.cc/M8YP-WDKU].

115.    In June 2022, an investigation by The Markup[29] revealed that one Tracking Pixel, the Meta Pixel, collected and sent a "data packet" to Facebook whenever a user engaged with some hospital websites, such as clicking to schedule a doctor appointment.

116.    Further research by The Markup revealed that the personal health data transmitted to Facebook by the Meta Pixel from hospital websites included not just sensitive health information, such as details about medications, allergies, and upcoming doctor visits, but also personally identifiable information, including patients' names, addresses, email addresses, and phone numbers.

117.    Additionally, The Markup's investigation found that the Meta Pixel was embedded in public-facing hospital websites and within password-protected patient portals at seven health systems, including FastMed and Novant Health.[30]

118.    The Federal Trade Commission ("FTC") has taken enforcement action against Internet providers who track sensitive health data.

119.    For example, in June 2022, the FTC finalized a settlement with Facebook regarding its covert collection of sensitive medical data when Flo, an ovulation tracking app, shared users' private health information with Facebook[31] and other advertisers.[32]

---

[29] *About Us*, The Markup, www.themarkup.org/about [https://perma.cc/RUU9-JUQS].
[30] *Id.*
[31] *FTC Finalizes Order with Flo Health, a Fertility-Tracking App that Shared Sensitive Health Data with Facebook, Google, and Others*, FTC (Jun 22, 2021), https://www.ftc.gov/news-events/news/press-releases/2021/06/ftc-finalizes-order-flo-health-fertility-tracking-app-shared-sensitive-health-data-facebook-google [https://perma.cc/V33W-LEEE].
[32] Justin Sherman, *Your Health Data Might Be for Sale*, Slate (Jun 22, 2022, 5:50 AM), https://slate.com/technology/2022/06/health-data-brokers-privacy.html [https://perma.cc/L7U4-4VMW].

### III.  The Unauthorized Collection of Personal Health Data Contravenes Legal, Ethical, and Social Norms

#### A.  Website Users Reasonably Expect Personal Health Information to Be Confidential

120. Personal health data collected by Tracking Pixels, Session Replay Code, and other tracking technologies may be "highly personal information that people choose not to disclose even to family, friends, or colleagues," which nevertheless "is actually shared with complete strangers."[33]

121. According to the FTC, personal health information is **"[a]mong the most sensitive categories of data collected by connected devices[.]"**[34]

122. Personal health information collected by websites "may pose an incalculable risk to personal privacy."[35] The practice of allowing Third-Party Vendors to "collect that data, combine it, and sell or monetize it" would be an "unprecedented intrusion."[36] That is exactly what Defendants have done, and are doing.

123. Consumers' confidence that their personal and private health data will be kept secure is a major public health issue.

---

[34] Kristin Cohen, *Location, health, and other sensitive information: FTC committed to fully enforcing the law against illegal use and sharing of highly sensitive data*, FTC (July 11, 2022) https://www.ftc.gov/business-guidance/blog/2022/07/location-health-and-other-sensitive-information-ftc-committed-fully-enforcing-law-against-illegal [https://perma.cc/67CF-PZ3Y].
[35] *Id.*
[36] *Id.*

124.    A 2015 review found that "the social stigma associated with some health conditions is among the top reasons consumers delay or avoid getting help for mental health problems."[37]

125.    The fear of "disclosure and confidentiality concerns" was a prominent cause of this stigma.[38]

126.    Once a person's private and sensitive health information is available, it exposes that individual to significant harm.

127.    Personal health data are used by criminals and other malevolent actors to facilitate phishing scams, commit identity theft, and inflict physical or emotional injury.[39]

128.    Information about private health and medical matters, especially data related to sexual activity or reproductive health, "may subject people to discrimination, stigma, mental anguish, or other serious harms."[40]

## B.    Personal Heath Information Can Be Harvested for Commercial Gain

129.    Companies that collect personal information "have a profit motive to share data at an unprecedented scale and granularity."[41]

---

[37] *Report: Companies continue to share health data despite new privacy laws*, Consumer Reports (Jan. 15, 2024), https://advocacy.consumerreports.org/research/report-companies-to-share-health-data-despite-new-privacy-laws/ [https://perma.cc/2WRY-6QAB].
[38] *Id.*
[39] Kristin Cohen, *Location, health, and other sensitive information: FTC committed to fully enforcing the law against illegal use and sharing of highly sensitive data*, FTC (July 11, 2022) https://www.ftc.gov/business-guidance/blog/2022/07/location-health-and-other-sensitive-information-ftc-committed-fully-enforcing-law-against-illegal [https://perma.cc/67CF-PZ3Y].
[40] *Id.*
[41] *Id.*

130.    Once an individual's personal and private health data are collected, they "often have no idea who has it or what's being done with it."

131.    The data "enters a vast and intricate sales floor frequented by numerous buyers, sellers, and sharers."[42]

132.    In a 2014 study, the FTC reported that data brokers use data collected from consumers to create profiles that may contain sensitive inferences, such as categorizing someone as an "expectant parent."[43]

133.    Once these invasive and sensitive profiles have been created, the brokers use them to target "personalized" ads at people, tracking them across the Internet.[44]

134.    The categories that consumers are placed into can be incredibly private or invasive, such as "working-class mom," "frequent alcohol drinker," "financially challenged," or "depression sufferer."[45]

135.    In the same 2014 study, one data broker bragged to shareholders that it had 3,000 points of data for nearly every consumer in the United States.[46]

---

[42] *Id.*

[43] *Id.*; *Data Brokers: A Call For Transparency and Accountability: A Report of the Federal Trade Commission*, FTC (May 2014), https://www.ftc.gov/reports/data-brokers-call-transparency-accountability-report-federal-trade-commission-may-2014 [https://perma.cc/4LSS-RTV6].

[44] *Id.*

[45] *Online Advertising & Tracking,* EPIC, https://epic.org/issues/consumer-privacy/online-advertising-and-tracking/.

[46] *Data Brokers: A Call For Transparency and Accountability: A Report of the Federal Trade Commission*, FTC (May 2014), https://www.ftc.gov/reports/data-brokers-call-transparency-accountability-report-federal-trade-commission-may-2014 [https://perma.cc/4LSS-RTV6]; Kristin Cohen, *Location, health, and other sensitive information: FTC committed to fully enforcing the law against illegal use and sharing of highly sensitive data*, FTC (July 11, 2022) https://www.ftc.gov/business-guidance/blog/2022/07/location-health-and-other-sensitive-information-ftc-committed-fully-enforcing-law-against-illegal [https://perma.cc/67CF-PZ3Y].

136.    Data aggregators and brokers gather this collected personal data and "sell access to it (or analyses derived from it) to marketers, researchers, and even government agencies."[47]

137.    The scale of the personal and private data flowing from users to brokers is staggering.

138.    The sheer number of ads shown to Internet users is overwhelming, with Americans exposed to an estimated 5,000 ads daily.[48]

139.    According to the FTC, "some popular ad exchanges can handle tens of billions of auctions per day. Each auction involves a broadcast of consumer data being sent to potentially dozens of bidders simultaneously, despite only one of those parties – the winning bidder – actually using that data to serve a targeted ad."[49]

140.    Once private and personal data are in the hands of data brokers, "there are few (if any) technical controls ensuring that [they] do not retain that data for use in unintended ways."[50]

## C.    Regulatory Authorities Prohibit the Unauthorized Collection and Tracking of Private Health Information

141.    Cigna, as a health insurance issuer and a provider of health plans (including employer-sponsored group health plans), is a "covered entity" under HIPAA.

---

[47] *Id.*
[48] *Id.*
[49] *Unpacking Real Time Bidding through FTC's case on Mobilewalla*, FTC (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla [https://perma.cc/8WYU-UPGW].
[50] *Id.*

142.    CCS, as an entity that performs functions or activities on behalf of a "covered entity" under HIPAA, is a "business associate" under HIPAA, and thus subject to HIPAA's privacy regulations.

143.    The U.S. Department of Health and Human Services ("HHS") has issued a bulletin covering the use of online tracking technologies, such as Tracking Pixels and Session Replay Code, by these HIPAA–covered entities. The bulletin clarifies the privacy and security rules promulgated under HIPAA, 42 U.S.C. §§ 1320d–1320d-9.

144.    The HHS bulletin states that "[r]egulated entities are not enabled to use tracking technologies in a manner that would result in impermissible disclosures of [PHI] to tracking technology vendors or any other violations of the HIPAA rules."[51]

145.    The bulletin continues, "[f]or example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures."[52]

146.    The bulletin further explains that the PHI collected by tracking technologies placed on websites, such as Tracking Pixels and Session Replay Code, can include "an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, device IDs, or any unique identifying code."[53]

---

[51] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.
[52] *Id.*
[53] *Id.*

147.    Defendants' use of tracking technologies on the Website, such as Tracking Pixels, violates HHS's bulletin, which explicitly states that regulated entities like Defendants are not permitted to use tracking technologies in ways that lead to impermissible disclosures of PHI to third parties without obtaining HIPAA-compliant authorizations.

148.    The HHS bulletin further clarifies that disclosure of PHI to vendors for marketing purposes (including targeted advertising or analytics used to improve advertising performance) violates HIPAA without HIPAA-compliant authorization from the individual.

149.    Defendants' conduct, including enabling Third-Party Vendors to track insureds on Defendants' Website for advertising purposes, is exactly the type of unauthorized data sharing of sensitive medical information that the HHS bulletin states is prohibited.

150.    On user-authenticated websites, which require a user to log in before gaining access to the site, tracking technologies may "have access to an individual's diagnosis and treatment information, prescription information, billing information, or other information within the portal."[54]

151.    Even on unauthenticated websites, which do not require users to log in before gaining access to the website, tracking technologies may obtain access to an individual's PHI.

---

[54] *Id.*

152.    The HHS bulletin gives the following example: "[I]f an individual were looking at a hospital's webpage listing its oncology services to seek a second opinion on treatment options for their brain tumor, the collection and transmission of the individual's IP address, geographic location, or other identifying information showing their visit to that webpage is a disclosure of PHI to the extent that the information is both identifiable and related to the individual's health or future health care."[55]

153.    The HHS bulletin outlines the harms that disclosure of PHI may cause, including "identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI."[56]

154.    The disclosure of an individual's PHI "can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment."[57]

155.    In a joint letter sent on July 23, 2023, to hospital systems and telehealth providers, the FTC and the HHS Office for Civil Rights also reiterated the risks posed by the disclosure of an individual's personal health information to third parties.

[55] *Id.*
[56] *Id.*
[57] *Id.*

29

156.    The joint letter noted that such disclosures could reveal "sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, and where an individual seeks medical treatment."[58]

157.    At the state level, Pennsylvania also has statutes mandating confidentiality of medical records. These include 28 Pa. Code § 115.27 ("All [medical] records shall be treated as confidential[.]"); 35 Pa. Stat. § 7607 ("No person or employee, or agent of such person, who obtains confidential HIV-related information in the course of providing any health or social service [can disclose it absent written consent.]"); and 49 Pa. Code § 25.213(c) ("Medical records shall be kept confidential, unless disclosure is required for bona fide treatment, with the patient's written consent . . . .").

158.    The American Medical Association's ("AMA") *Code of Medical Ethics* also promulgates rules that protect the privacy of patient data and communications, which apply to Defendants.

159.    These AMA rules include, but are not limited to, *AMA Code of Medical Ethics* Opinion 3.1.1 ("[p]atient privacy encompasses a number of aspects, including . . . personal data"); Opinion 3.2.4 ("Information gathered and recorded in association with the care of the patient is confidential."); and Opinion 3.3.2

---

[58] *FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies*, FTC (July 20, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking [https://perma.cc/EB3S-UF3V].

("Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored.").

## IV.    Defendants Covertly Intercepted Plaintiffs' Sensitive Health Information for Commercial Profit

### A.    Defendants Covertly Wiretap Website Communications

160.    Despite deep public concerns about Internet privacy and the sensitivity of personal health-related data, Defendants unlawfully embedded code on the Website that allows Third-Party Vendors to harvest, for financial benefit, the sensitive private health information of the users of Defendants' Website, insureds of Cigna.

161.    Cigna also independently benefits from the Tracking Pixels and Session Replay on the Website, because this data allows Cigna to identify groups or segments among its insureds, and refine marketing to increase enrollment and revenue.

### B.    Defendants Enable The Trade Desk's Tracking Technology on Defendants' Website

162.    Defendants have embedded the tracking technology of Third-Party Vendor The Trade Desk on the Website in order to enable the interception and collection of users' private data and communications, including health-related queries, without user consent.

163.    The Trade Desk is a data-driven advertising company. Its core business relies on monitoring users' online behavior, including on sensitive health-related websites like Defendants' Website.

164. The Trade Desk profits by gathering information from tracking mechanisms like Tracking Pixels, which, among other things, facilitate lucrative personalized advertising.

165. The Trade Desk promotes its "DSP," or demand-side platform, which helps advertisers better target and measure their campaigns,[59] including by limiting the number of times the same person or household sees an advertisement.[60]

166. The Trade Desk incorporates data into systems like Unified ID 2.0,[61] which determine users' preferences and consumer inclinations, in order to deliver highly targeted advertisements.

167. The Trade Desk's embedded code on Defendants' Website harvests detailed personal and private information of users of Defendants' Website, including the exact keywords searched and user interactions with the Website.

168. The Trade Desk obtained highly sensitive health-related information of users of Defendants' Website with the intent of using the information it obtained for commercial gain through targeted advertising.

169. The following code from Defendants' Website shows how highly sensitive, private, personal data – in this case vision benefits (suggesting eye problems or issues) – are intercepted by The Trade Desk:

---

[59] *The leading demand-side platform for data-driven advertising*, The Trade Desk, https://www.thetradedesk.com/our-demand-side-platform [https://perma.cc/J65D-LFLS].

[60] Mason Widmer, *4 Vital Best Practices for Using The Trade Desk + A Top Tip*, Grapeseed Media (Nov. 6, 2024), https://grapeseedmedia.com/blog/trade-desk-best-practices/ [https://perma.cc/NE7P-LXCY].

[61] James Hercher, *The Trade Desk Says UID2 Has Now Reached 'Critical Mass'*, AdExchanger (Aug. 9, 2024, 9:51 AM), https://www.adexchanger.com/online-advertising/the-trade-desk-says-uid2-has-now-reached-critical-mass/ [https://perma.cc/G8DM-A64X].



*Fig. 1*

170.   As shown in the diagram above, the personal data intercepted as the result of Defendants' embedding of The Trade Desk's tracking technology includes *full and exact* search queries entered by users of Defendants' Website. The diagram above also shows that Defendants place a tracking cookie on users' browsers that transmits private data back to The Trade Desk.

171.   The cookie also assigns a unique identifier to that user's device, allowing Defendants and the Third-Party Vendors to persistently identify and monitor the user across sessions or pages, and to build a behavioral profile.

### C.    Defendants' Enabling of LiveRamp's Tracking Technology on Defendants' Website

172.    LiveRamp is another Third-Party Vendor for which Defendants have embedded tracking technology that enables LiveRamp to harvest the private data of users of Defendants' Website for marketing and commercial purposes, without adequately disclosing this fact to users or obtaining consent.

173.    LiveRamp, which calls itself a "data collaboration platform,"[62] is a company that helps businesses create comprehensive customer profiles, collecting data from both online and offline sources.[63]

174.    LiveRamp creates unique identifiers known as RampIDs that represent individual consumers or devices, matching data from various sources to create a unified profile for each client.[64]

175.    RampIDs allow advertisers to recognize and target users to deliver personalized advertisements.[65]

176.    LiveRamp specializes in linking online behavior to real-world identities.

177.    Although LiveRamp markets its capacity to help its clients conduct targeted advertising, it exposes individuals' sensitive health-related searches and activities for commercial gain.

---

[62] *Homepage*, LiveRamp, https://liveramp.com/ [https://perma.cc/JZH7-KCDC].
[63] *Enterprise Identity*, LiveRamp, https://liveramp.com/solutions/enterprise-identity/ [https://perma.cc/JD58-WB6Y].
[64] *RampIDs*, LiveRamp, https://developers.liveramp.com/rampid-api/docs/rampids [https://perma.cc/2FSZ-R2RQ].
[65] *RampID Methodology*, LiveRamp, https://docs.liveramp.com/connect/en/rampid-methodology.html [https://perma.cc/M7T4-3SC8].

178.    Defendants embedded LiveRamp's tracking technologies on the Website.

179.    Defendants' embedding of LiveRamp's code on the Website allowed LiveRamp to surreptitiously harvest data about users' visits, including keyword searches, and potentially match that data to offline profiles.

180.    The following code from Defendants' Website shows how highly sensitive, private, personal data – in this case **vision benefits** (suggesting eye problems or issues) – are intercepted by LiveRamp:



*Fig. 2*

181.   As shown in the above diagram, the personal data intercepted as the result of Defendants' embedding of LiveRamp's code include *full and exact* search queries made by users on Defendants' Website.

182.   The above diagram additionally shows that Defendants place a tracking cookie on Website users' browsers that persistently sends their personal, highly sensitive private data to LiveRamp.

183.   The cookie also assigns a unique identifier to that user's device, allowing Defendants and the Third-Party Vendors to persistently identify and monitor the user across sessions or pages, and to build a behavioral profile.

### D.    Defendants' Enabling of Demandbase's Tracking Technology on Defendants' Website

184.   Defendants have embedded the tracking technology of Third-Party Vendor Demandbase on the Website in order to enable the interception and collection of users' private data and communications, including health-related queries, without user consent.

185.   Demandbase is a company specializing in "account-based" marketing for business to business (B2B) entities.[66]

186.   The company promotes its Demandbase One platform, which integrates advertising, sales, and data analytics to help businesses identify other businesses for advertising.[67]

---

[66] *Homepage*, Demandbase, https://www.demandbase.com/ [https://perma.cc/G3SM-NZA4].
[67] *DEMANDBASE ONE™ | Go-to-Market Platform*, Demandbase, https://www.demandbase.com/products/ [https://perma.cc/R48C-CVR2].

187.    Demandbase openly acknowledges its commercial use of data, stating on the Website: "**We don't just grab data—we own it**."[68]

188.    Defendants embedded Demandbase's tracking technologies on the Website.

189.    Demandbase's tools extract data from unknowing users, including Plaintiffs, to monetize through targeted advertising and analytics.

190.    The following code from Defendants' Website shows how highly sensitive, private, personal data – regarding an inquiry about a **hysterectomy** – are intercepted by Demandbase:



*Fig. 3*

191.    As shown in the diagram above, the personal data intercepted as the result of Defendants' embedding of Demandbase's tracking technology include *full and exact* search queries entered by users of Defendants' Website.

---

[68] *Id.*

192.    Additionally, the diagram above shows that Defendants place a tracking cookie on users' browsers that transmits private data back to Demandbase.

193.    The cookie also assigns a unique identifier to that user's device, allowing Defendants and the Third-Party Vendors to persistently identify and monitor the user across sessions or pages, and to build a behavioral profile.

**E.    Defendants' Enabling of MediaMath's Tracking Technology on Defendants' Website**

194.    Defendants have embedded the tracking technology of Third-Party Vendor MediaMath on the Website in order to enable the interception and collection of users' private data and communications, including health-related queries, without user consent.

195.    MediaMath is a digital advertising technology company that collects user data to deliver targeted advertisements.[69]

196.    For its advertising services, MediaMath collects, aggregates, and analyzes extensive amounts of consumer data through pixels and other tracking mechanisms embedded in websites.[70]

197.    Defendants embedded MediaMath's tools on Defendants' Website, enabling MediaMath to intercept and collect detailed user interaction data, including users' search queries.

---

[69] *Homepage*, MediaMath, https://www.mediamath.com/ [https://perma.cc/W978-K7ZM].
[70] *MediaMath*, Twilio Segment, https://segment.com/catalog/integrations/destination/mediamath/ [https://perma.cc/ZSQ2-WLWQ].

198.   MediaMath fed private data from users of Defendants' Website into its systems in order to conduct targeted advertising for commercial gain. This occurred regardless of whether users had consented to such data harvesting.

199.   The following code from Defendants' Website shows how highly sensitive, private, personal data – again **vision benefits** – are intercepted by MediaMath:



*Fig. 4*

200.   As shown in the diagram above, the personal data intercepted as the result of Defendants' embedding of MediaMath's tracking technology include *full*

*and exact* search queries entered by users of Defendants' Website. The diagram above also shows that Defendants place a tracking cookie on users' browsers that transmits private data back to MediaMath.

201.    The cookie also assigns a unique identifier to that user's device, allowing Defendants and the Third-Party Vendors to persistently identify and monitor the user across sessions or pages, and to build a behavioral profile.

**F.    Defendants' Enabling of Pinterest's Tracking Technology on Defendants' Website**

202.    Defendants have embedded the tracking technology of Third-Party Vendor Pinterest on the Website in order to enable the interception and collection of users' private data and communications, including health-related queries, without user consent.

203.    Pinterest is known primarily as a visual platform where users can find and "pin" ideas for a range of interests or hobbies, such as fashion or travel.

204.    While Pinterest is publicly known as a social media company, it also operates an advertising technology business that tracks users across the Internet—including on Defendants' Website—to collect data for targeted advertising.

205.    Pinterest markets its "Pinterest Tag," a piece of JavaScript code that businesses can add to their websites to monitor user interactions and collect data on user activity.[71]

---

[71] *Install the Pinterest tag*, Pinterest, https://help.pinterest.com/en/business/article/install-the-pinterest-tag [https://perma.cc/8AFS-3N4D].

206.    Defendants embedded Pinterest's tracking technologies, thereby allowing it to intercept and collect information on Defendants' Website about visits from insureds and users, including their zip codes and search queries.

207.    In so doing, Pinterest harvested sensitive health-related information from Cigna's insureds who were seeking medical coverage or researching private medical concerns.

208.    Defendants' conduct disregarded the confidentiality of healthcare-related browsing activity, compromising users' privacy for commercial gain.

209.    The following code from Defendants' Website shows how highly sensitive, private, personal data are intercepted by Pinterest:



*Fig. 5*

210.    As shown in the diagram above, the personal data intercepted as the result of Defendants' embedding of Pinterest's tracking technology include *full and exact* search queries entered by users of Defendants' Website. The diagram above also shows that Defendants place a tracking cookie on users' browsers that transmits private data back to Pinterest.

211.    The cookie also assigns a unique identifier to that user's device, allowing Defendants and the Third-Party Vendors to persistently identify and monitor the user across sessions or pages, and to build a behavioral profile.

**G.    Defendants' Enabling of Snapchat's Tracking Technology on Defendants' Website**

212.    Defendants have embedded the tracking technology of Third-Party Vendor Snapchat on the Website in order to enable the interception and collection of users' private data and communications, including health-related queries, without user consent.

213.    Snapchat is a social media and technology company owned by Snap Inc., which offers a popular mobile application used primarily for sending media that disappears after being viewed.

214.    In addition to this consumer-facing application, Snap Inc. operates an advertising business that provides website owners with tools to track, analyze, and target users on the Internet.

215.    One such tool is the Snap Pixel, a piece of code that tracks users'
interactions with a website, including their pages visited, any buttons clicked, and
the full text of any search queries entered.[72]

216.    Snapchat advertises that website owners can "easily install the Snap
Pixel in just 5 minutes" and "ensure [the] Pixel is working properly with these Snap
tools."[73]

217.    These data are used to build user profiles and "optimize" advertising
campaigns—without the users' knowledge or explicit consent.[74]

218.    According to Snap's own video tutorials, the Snap Pixel allows
advertisers to track website conversions, build custom audiences, and optimize ad
delivery.[75]

219.    Although Snap Inc. does not publicly disclose revenue specifically
attributable to the Snap Pixel, it reported total revenues of approximately $4.6
billion in 2022 and $4.6 billion again in 2023.[76]

220.    Defendants embedded Snapchat's tracking technologies—such as its
Snap Pixel—on Defendants' Website, enabling Snapchat to intercept and collect
detailed information about users' Website interactions.

---

[72] Snap Pixel: Power Your Ad Performance, Snap Inc.,
https://forbusiness.snapchat.com/advertising/snap-pixel [https://perma.cc/U3WQ-S52K].
[73] *Id.*
[74] *Id.*
[75] *Videos For Snap Pixel*, Snap Inc., https://businesshelp.snapchat.com/s/article/pixel-
videos?language=en_US [https://perma.cc/P43H-4G6E].
[76] *Snap Inc. Announces Fourth Quarter and Full Year 2023 Financial Results*, Snap Inc. (Feb. 6,
2024), https://investor.snap.com/news/news-details/2024/Snap-Inc.-Announces-Fourth-Quarter-and-
Full-Year-2023-Financial-Results/default.aspx.

221.   In so doing, Snapchat captures and monetizes highly sensitive health-related information for commercial gain.

222.   The following code from Defendants' Website shows how highly sensitive, private, personal data – in this case extremely personal and confidential data regarding **vasectomy** – are intercepted by Snapchat:



*Fig. 6*



*Fig. 7*

223.    As shown in the diagram above, the personal data intercepted as the result of Defendants' embedding of Snapchat's tracking technology include *full and exact* search queries entered by users of Defendants' Website. The diagram above also shows that Defendants place a tracking cookie on users' browsers that transmits private data back to Snapchat.

224.    The cookie also assigns a unique identifier to that user's device, allowing Defendants and the Third-Party Vendors to persistently identify and monitor the user across sessions or pages, and to build a behavioral profile.

45

225.    Indeed, Snapchat confirms that the purpose of the cookie in question is to "identify a visitor across multiple domains."[77]

## H.    Defendants' Enabling of Meta's Tracking Technology on Defendants' Website

226.    Defendants have embedded the tracking technology of Third-Party Vendor Meta on the Website in order to enable the interception and collection of users' private data and communications, including health-related queries, without user consent.

227.    Meta Platforms, Inc., formerly known as Facebook, Inc., is a technology company that operates several social media platforms, including Facebook, Instagram, Messenger, and WhatsApp.[78]

228.    Meta generates the vast majority of its revenue from advertising across these social media platforms.[79]

229.    In 2021, Meta made more than $100 billion in advertising revenue.[80]

230.    In 2023, Meta's advertising revenue totaled approximately $133 billion, accounting for nearly 98% of its total revenue.[81]

231.    Meta is reliant on this advertising revenue. In February of 2022, Business Insider reported that Meta (Facebook's parent company) stood to lose as

---

[77] *Cookie Information*, Snap Inc. (Apr. 8, 2025), https://www.snap.com/privacy/cookie-information [https://perma.cc/3H4D-CLPA].

[78] *Company Information, Culture, and Principles*, Meta, https://about.meta.com/company-info/.

[79] Matthew Johnston, *How Does Facebook (Meta) Make Money?*, Investopedia (Jun. 29, 2024), https://www.investopedia.com/ask/answers/120114/how-does-facebook-fb-make-money.asp#citation-60 [https://perma.cc/E3KH-NFEK].

[80] Andrew Hutchinson, *Facebook Loses a Million Daily Active Users, Posts Big Revenue Result for Full Year 2021*, Social Media Today (Feb. 2, 2022), https://www.socialmediatoday.com/news/facebook-loses-a-million-daily-active-users-posts-big-revenue-result-for-f/618224/ [https://perma.cc/T2FN-M46B].

[81] *Id.*

much as $10 billion annually due to an Apple update that allowed iPhone users to opt out of cross-app tracking.[82]

232.    The Meta Pixel is a snippet of JavaScript code developed and disseminated by Meta that can be embedded on websites, enabling Meta to collect information about users' interactions, browsing behavior, and personal data.[83]

233.    Meta utilizes this data collected through its Meta Pixel to develop advertising strategies, facilitate targeted advertising campaigns, and track the effectiveness of existing advertising.[84]

234.    Defendants embedded the Meta Pixel on the Website.

235.    The following code from Defendants' Website shows how data are intercepted by Meta:



---

[82] Ben Gilbert, *Facebook blames Apple after a historically bad quarter, saying iPhone privacy changes will cost it $10 billion*, Business Insider (Feb. 3, 2022), https://www.businessinsider.com/facebook-blames-apple-10-billion-loss-ad-privacy-warning-2022-2.
[83] *Meta Pixel*, Meta, https://www.facebook.com/business/tools/meta-pixel.
[84] *Id.*

*Fig. 8*

236.    Unlike the other Third-Party Vendors, Meta appears only to receive information that confirms that the user is present on Defendants' Website.

237.    Even if these data are anonymized, each Third-Party Vendor builds comprehensive user profiles containing enough information to easily de-anonymize individuals.

## V.  Plaintiffs Did Not Consent to Defendants' Interception, Harvesting, and Collection of Their Personal Heath Data

### A.    Defendants Do Not Obtain Consent Prior to Surreptitiously Harvesting the Private Heath Data of Website Users

238.    Defendants' Website represents that it offers a secure and confidential digital experience for accessing health insurance services and health information, including an award for safeguarding customer data and privacy.[85]

239.    This messaging strongly conveys to Website users that Defendants do not exploit their personal heath data – including data collected via the Website – for marketing purposes or transmit data to third parties without clear consent.

240.    In a section of the Website labeled "Legal and Privacy Information," Defendants further affirm: "We value your trust in us and are committed to protecting your personal health information":[86]

---

[86] *Legal and Privacy Information,* Cigna Healthcare, https://www.cigna.com/legal/members/ [https://perma.cc/S2TL-TXF6].

# Legal and Privacy Information

We value your trust in us and are committed to protecting your personal health information. Below you will find our privacy practices, forms, and general legal information.

241.    This language conveys a commitment to the protection of user data, particularly information that may be subject to HIPAA and other privacy laws and regulations.

242.    These representations led users like Plaintiffs to reasonably believe that Defendants do not share or disclose sensitive health-related information or Website usage to third parties without express authorization.

243.    For example, on or around November 22, 2024, Plaintiff Pham visited a portal on Defendants' Website, which was labeled "Get Access to Your Personal Health Information":



244.    Likewise, during Plaintiff Danielson's visits, she encountered the same language:



245. The title, with the use of the word "personal," conveyed to Plaintiffs that the Website was private and secure, and that any health data accessed or entered would be protected and not shared with third parties. The word "personal" refers to something that belongs to and concerns a specific individual, rather than something shared or public.[87]

246. Furthermore, the requirement of a password implies heightened confidentiality and user control. Nevertheless, Defendants made Plaintiffs' private health data accessible to Third-Party Vendors.

247. The relevant HIPAA regulations demonstrate the reasonable expectations of Plaintiffs who engaged with the Website under the belief that their health-related data would remain confidential and protected.

**B.    Unlawful Interception of Plaintiffs' Website Communications**

248. In reality, tracking technologies on Defendants' Website, including Tracking Pixels and Session Replay Code, begin intercepting a user's Website Communications *immediately* **upon the loading of Defendants' Website**.

249. Defendants' Website does not display a pop-up, banner, or consent prompt when users begin interacting with coverage tools, provider searches, or other health-related features.

250. Defendants' Website does not present its privacy policy in any conspicuous or easily accessible location before the tracking and data collection begins.

---

[87] "Personal," *Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/personal (last visited May 9, 2025).

251.    Instead, the privacy policy is buried in the footer of the homepage.

252.    Plaintiffs did not know that tracking technologies, including Tracking Pixels and Session Replay Code, were being used on Defendants' Website.

253.    When a user navigates to Defendants' Website, the user is not presented with any notification or alert regarding the personal data collected by tracking technologies Defendants embedded on their Website.

254.    Such notifications, which may be referred to as "pop-up" or "clickwrap" agreements, require a website user to affirmatively consent to their data being collected, often by selecting an option stating "I agree" or something similar, which Defendants' Website does not have.

255.    In contrast to a conspicuous pop-up or notification, the privacy policy on Defendants' Website is buried behind multiple links, the first of which is at the very bottom of Defendants' Website.[88]



256.    Once a Website user has located the "Privacy" link at the bottom of Defendants' Website, clicking the link does not take one to Defendants' privacy policy, but to another page with multiple links to various disclosures.[89]

---

[88] *Id.*
[89] *Id.*



257.    A user needs to select the correct link from these available options, download a pdf document, open the document, and scroll down through the document to the sixth page to find where Defendants disclose certain practices regarding the interception and collection of their personal and private health information through the uses of tracking technologies.[90]

---

[90] *Cigna Healthcare Website Privacy Notice,* Cigna Healthcare (Feb. 11, 2025), https://www.cigna.com/static/www-cigna-com/docs/website-privacy-notice.pdf [https://perma.cc/58PH-H6A6].

**1.    Cookies and Other Technologies**

A cookie is a small alphanumeric identifier that is placed on your website browser when you visit a website. Cookies are transferred to your device's hard drive through your web browser for record-keeping purposes. Some cookies allow us to make it easier for you to navigate our Services, while others are used to allow us to track your activities at our Services. Below are descriptions of the cookies and other technologies we use on our Site.

- **Session Cookies**. Session cookies exist only during an online session. They disappear from your device when you close your browser or turn off your device. We use session cookies to allow our systems to uniquely identify you during a session while accessing our Services. This allows us to display content and provide our Services to you while navigating our Site.
- **Persistent Cookies**. Persistent cookies remain on your device after you have closed your browser or turned off your device. We use persistent cookies to track statistical information about user activity.
- **Clear GIFs, Pixel Tags and Other Technologies**. Clear GIFs are tiny graphics with a unique identifier, similar in function to cookies. In contrast to cookies, which are stored on your computer's hard drive, clear GIFs are embedded invisibly on web pages. We may use clear GIFs (a.k.a. web beacons, web bugs or pixel tags), in connection with our

Services to, among other things, track activities of Site visitors, and to help us manage content on our Services.
- **Third-Party Analytics**. We use third-party tools, such as Google Analytics, which are operated by third-party companies, to evaluate usage of our Services. These third-party analytics companies use cookies, pixels, and other tracking technologies to collect usage data about our Services to provide us with reports and metrics that help us evaluate usage of our Services, improve our Services, and enhance performance and user experiences. To learn more about Google's privacy practices, please review the Google Privacy Notice at https://www.google.com/policies/privacy/partners/.
- **Third-Party Advertising**. We work with third-party ad networks, analytics, marketing partners, and others ("**third-party ad companies**") to personalize content and display advertising within our Services, as well as to manage our advertising on third-party Websites. We and these third-party ad companies may use cookies, pixels tags, and other tools to collect browsing and activity information within our Services (as well as on third-party websites and services), as well as IP address, unique ID, cookie and advertising IDs, and other online identifiers. We and these third-party ad companies use this information to provide you more relevant ads and content within our Services and on third-party websites, and to evaluate the success of such ads and content.
- **Session Replay**. We use session replay technologies so we can diagnose problems with our Services and identify areas for improvement. The data collected by this technology is not accessible by or shared with third parties or service providers.

258.    While Defendants include this generalized description of its use of cookies and "other technologies" in the Website privacy policy, its disclosures are vague, incomplete, and misleading.

259.    The disclosures state that Defendants work with "third-party ad companies" to "personalize content." But Defendants do not anywhere disclose that page views, queries, and site interactions will be directly transmitted to Third-Party Vendors for advertising profiling or targeting purposes.

260.    The disclosures also reference "third-party tools" such as Google Analytics and vaguely state they are "operated by third-party companies," but Defendants intentionally do not describe what these tools are or identify recipients such as The Trade Desk, which is known for using browsing activity in order to construct advertising profiles.

261.    The disclosures additionally refer to the collection of "IP address, unique ID, cookie and advertising IDs," but fail to inform users that this collection occurs in connection with Website users' searches for health benefits, medical conditions, providers, and/or insurance eligibility.

262.    The disclosures are buried in a dense block of technical language. Terms are used like "clear GIFs," "pixel tags," and "web bugs," but there is no explanation in plain language that these comprise technologies that track Website users' behavior across pages involving sensitive health inquiries.

263.    The disclosures misleadingly claim that Defendants use data "to personalize content and display advertising within our Services." This implies that advertisements would only potentially appear on Defendants' Website, but in practice, Tracking Pixels and Session Replay Code enable advertisement targeting across the Internet – something not clearly disclosed or consented to.

264.    The disclosures combine less invasive or routine Website functions (e.g., cookies) alongside much more invasive functions like Session Replay Code, a bundling that purposely obscures the risks of the more invasive functions.

265.    The disclosures are not presented at the point of data collection, such as when a user begins typing a sensitive medical condition.

266.    Critically, the disclosures *make no mention whatsoever* **of Website users' rights under HIPAA in the section about Cookies and Other Tracking Technologies**. There is no mention of how tracking technologies may involve PHI, nor any reference to users' rights to restrict the disclosure of that information under HIPAA.

267.    Defendants' description that "[we] use this information to provide you more relevant ads" presents the practice as a benefit to the user while omitting the fact that highly sensitive personal health data may be shared without consent.

268.    Defendants reference "other online identifiers" such as advertising IDs and IP addresses, but do not make clear that these can be used to create profiles across the Internet, nor that such tracking is active on webpages involving personal health-related searches.

269.    Finally, the language of Defendants' disclosures is passive and permissive, with neutral sounding phrases like "we may use," without a plain explanation that Third-Party Vendors are actively collecting identifiable information from Defendants' Website and using it for commercial gain.

270.    Users are not asked to consent prior to browsing Defendants' Website, and they are wiretapped **from the moment they load the site**, regardless of whether they eventually navigate to, download, read, or understand the disclosures in the privacy notice.

271.    Defendants do not offer users any mechanism to meaningfully opt out of such data collection.

272.    At no point do Defendants seek affirmative consent from users prior to the initiation of data tracking.

273.    Valid consent to interception must be actual, informed, and voluntary.

274.    In sum, the privacy policy on Defendants' Website is written in dense and vague legal language, and structured to deflect the users' attention from the scope of impermissible, unlawful data collection. It provides no explanation of the tracking technologies, no complete disclosure about the sharing of queries and sensitive information with third-parties (including which third parties), and no way to opt out of such data sharing. Insureds like Plaintiffs, who reasonably expect confidentiality on a password-protected "personal" healthcare website, are ultimately left unaware that their keystrokes, searches, and clicks are being intercepted in real-time. This deception cannot constitute actual, informed, or voluntary consent.

275.    In light of the above, Plaintiffs did not consent to Defendants' interception and collection of their Website Communications.

## C.    Defendants' Conduct Violates HIPAA's Privacy Rules

276.    Because Defendants' Website is operated for Cigna, a health insurance provider, users have an elevated expectation that their activity will remain private and secure.

277.    Relatedly, courts and regulators have recognized that health-related data warrants elevated privacy protections due to its sensitivity and the risk of its misuse.

278.    HIPAA's enhanced protections for health-related data support the conclusion that Plaintiffs had a reasonable expectation of privacy in interacting with Defendants' Website.

279.    HIPAA prohibits business associates of covered entities like Defendants from using or disclosing PHI for purposes such as marketing, analytics, or other transmissions to third parties, unless the individual has provided a valid, written authorization. *See* 45 C.F.R. § 164.508(a)(3).

280.    A valid HIPAA authorization must be written, specific, and signed by the individual. It must identify the data to be used or disclosed, the recipient, and the purpose. *See* 45 C.F.R. § 164.508(c)(1)(i)–(vi).

281.    Defendants' integration of tracking technologies on its pages results in the automatic and unauthorized transmission of sensitive health-related data of the insureds of Cigna to third parties that include the Third-Party Vendors.

282.    At no point did Defendants obtain HIPAA-compliant written authorizations from such users before this transmission occurred.

283.    The privacy policy on Defendants' Website does not come close to providing the specificity, clarity, or accessibility required to satisfy HIPAA's notice and its authorization requirements.

284.    Defendants' failure to transparently disclose its data practices, along with how users engage with the Defendants' Website, violates HIPAA's core principle that individuals must be given control over their health information and be empowered to authorize or reject such disclosures.

285.    By covertly transmitting user interactions related to health services to third parties without authorization, Defendants have failed to meet the heightened duty of care owed to entities in possession of sensitive health information, as memorialized in HIPAA's statutory and regulatory regime.

286.    In essence, Defendants failed in their core healthcare obligations by prioritizing marketing analytics and commercial gain over patient privacy.

**D.    Tolling of the Statutes of Limitation**

287.    None of the Plaintiffs were aware that their private health data were being intercepted and sent to the Third-Party Vendors.

288.    None of the Plaintiffs consented to Defendants and the Third-Party Vendors intercepting their private health data.

289.    Plaintiffs could not have, despite full diligence, discovered the full scope of Defendants' conduct as alleged herein, as there was no indication of the scope of the above-described tracking technologies that Defendants employ on Defendants' Website.

290.    Accordingly, the applicable statutes of limitation have been tolled as a result of Defendants' knowing and active concealment and denial of the full scope of its use of these tracking technologies.

291.    Defendants were under a duty to disclose the nature and extent of their data collection practices but did not do so.

292.    Defendants are therefore estopped from relying on any statute of limitations defenses.

## CLASS ACTION ALLEGATIONS

293.    Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23, individually and on behalf of a putative class of the following similarly situated individuals (collectively, the "Class"):

> Every current and former insured of Cigna whose Website Communications were captured from May 9, 2023 through the use of Tracking Pixels and/or Session Replay Code embedded in Defendants' Website, www.cigna.com, and subpages to the date of judgment herein.

294.    **Numerosity:** The Class includes thousands of people, such that it is not practicable to join all class members into one lawsuit.

295.    **Commonality:** This case presents questions of law and fact that are common to the Class, including:

- Whether Defendants enable Third-Party Vendors to intercept the Website Communications of users to Defendants' Website, www.cigna.com, and subpages;

- Whether Defendants intentionally disclose the intercepted Website Communications of the Website users;

- Whether Defendants acquire the contents of Website users' Website Communications without their consent;

- Whether Defendants' conduct violates WESCA;

- Whether Plaintiffs and Class members are entitled to equitable relief; and

- Whether Plaintiffs and Class members are entitled to actual, statutory, punitive, or other forms of damages, and other monetary relief.

296. **Typicality:** Plaintiffs, Class members, and Defendants have a commonality of interest in the subject matter of the lawsuit and the remedy sought.

297. **Predominance:** The common questions of law and fact predominate over any individual issue that may arise on behalf of an individual Class member.

298. **Superiority:** A class action is the appropriate vehicle for fair and efficient adjudication of the claims of Plaintiffs and Class members because if individual actions were required to be brought by each member of the Class, the result would be a multiplicity of actions, creating hardship to the Class, to the Court, and to Defendants.

299. **Adequacy of representation:** Plaintiffs and counsel will fairly and adequately protect the interests of Class members.  Plaintiffs' counsel, Schlichter Bogard, will fairly and adequately represent the interests of the Class. Schlichter Bogard has a well-documented track record of successfully serving as class counsel in this Circuit and elsewhere. Schlichter Bogard's pioneering work in class actions

has been covered by numerous national publications, including the New York Times and Wall Street Journal, among other media outlets.

300.    Schlichter Bogard has also been widely recognized by federal judges across the United States as pioneers in fiduciary breach class action litigation. Schlichter Bogard's vast experience in this area is reflected by the firm's appointment as class counsel in over 40 fiduciary breach class actions.

301.    Federal judges have repeatedly recognized that Schlichter Bogard's efforts and successful outcomes have led to "enormous" savings for class members. *E.g.*, *Cates v. Trs. of Columbia Univ.*, No. 1:16-cv-06524-GBD, 2021 U.S. Dist. LEXIS 200890, at *15–16 (S.D.N.Y. Oct. 18, 2021).

302.    Schlichter Bogard has additionally handled, and repeatedly prevailed in, fiduciary breach class action litigation in the U.S. Supreme Court. For example, in *Tibble v. Edison International*, a landmark fiduciary breach class action handled by Schlichter Bogard, after a partial loss in the U.S. District Court for the Central District of California, which was upheld by the U.S. Court of Appeals for the Ninth Circuit, Schlichter Bogard achieved a reversal before the Supreme Court of the United States. The Supreme Court's vacatur in favor of the plaintiffs was unanimous. *See Tibble v. Edison Int'l*, 135 S. Ct. 1823 (2015).

303.    Schlichter Bogard recently secured a reversal of a dismissal before the U.S. Supreme Court, again in a unanimous decision, in *Hughes v. Northwestern University* – another fiduciary breach class action. *See Hughes v. Nw. Univ.*, 595 U.S. 170 (2022).

304.    In *Cunningham v. Cornell University*, yet another fiduciary breach class action, which was decided by the U.S. Supreme Court less than one month ago, Schlichter Bogard again achieved a unanimous victory. *See Cunningham v. Cornell Univ.*, No. 23-1007, —S. Ct.—, 2025 WL 1128943, 2025 U.S. LEXIS 1458 (Apr. 17, 2025).

305.    Other courts have repeatedly heralded Schlichter Bogard's work in class action litigation. By way of limited example:

306.    "The Court finds that Rule 23(g) is satisfied because the law firm Schlichter Bogard & Denton LLP, is capable of fairly and adequately representing the interests of the Settlement Class. Class Counsel has done substantial work on this case, including significant investigation, both before filing and thereafter, of the underlying merit of Plaintiffs' claims alleged in the Class Action." *Sweda v. Univ. of Pa.*, Civil Action No. 16–4329, 2021 U.S. Dist. LEXIS 121336, at *26 (E.D. Pa. Jun. 28, 2021).

307.    "This Court is unaware of any comparable achievement of public good by a private lawyer in the face of such obstacles and enormous demand of resources and finance." Order on Attorney's Fees, *Mister v. Illinois Central Gulf R.R.*, No. 81-3006 (S.D. Ill. 1993).

308.    "Class Counsel performed substantial work . . . investigating the facts, examining documents, and consulting and paying experts to determine whether it was viable. This case has been pending since September 11, 2006. Litigating the case required Class Counsel to be of the highest caliber and committed to the

interests of the [class]." *Will v. General Dynamics*, No. 06-698, 2010 WL 4818174, at *2 (S.D. Ill. Nov. 22, 2010).

309.    "Schlichter, Bogard & Denton has achieved unparalleled results on behalf of its clients, . . . has invested . . . massive resources and persevered in the face of . . . enormous risks[.]" *Nolte v. Cigna Corp.*, No. 07-2046, 2013 WL 12242015, at *2 (C.D. Ill. Oct. 15, 2013).

310.    "Litigating this case against formidable defendants and their sophisticated attorneys required Class Counsel to demonstrate extraordinary skill and determination." *Beesley v. Int'l Paper Co.*, No. 06-703, 2014 WL 375432, at *2 (S.D. Ill. Jan. 31, 2014).

311.    "Schlichter, Bogard & Denton demonstrated extraordinary skill and determination in obtaining this result for the Class." *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 WL 4398475, at *2 (S.D. Ill. July 17, 2015).

## CAUSES OF ACTION

### COUNT I – VIOLATION OF WESCA, 18 Pa.C.S. § 5701 et seq.
### (ON BEHALF OF PLAINTIFFS AND THE CLASS)

312.    Plaintiffs incorporate the preceding paragraphs as though fully realleged herein.

313.    WESCA prohibits (1) the interception or procurement of another to intercept any wire, electronic, or oral communication; (2) the intentional disclosure of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication; and (3) the intentional use of the contents of any

63

wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication. 18 Pa.C.S. § 5703.

314.    Any person who intercepts, discloses, or uses or procures any other person to intercept, disclose, or use, a wire, electronic, or oral communication in violation of the Act is subject to a civil action for (1) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred. 18 Pa.C.S. § 5725(a).

315.    "Intercept" is defined as any "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device." 18 Pa.C.S. § 5702.

316.    "Contents" is defined as "used with respect to any wire, electronic or oral communication, is any information concerning the substance, purport, or meaning of that communication." 18 Pa.C.S. § 5702.

317.    "Person" is defined as "any individual, partnership, association, joint stock company, trust or corporation." 18 Pa.C.S. § 5702.

318.    Defendants are both a "person" for purposes of WESCA because they are corporations. 18 Pa.C.S. § 5702.

319.    "Device" is defined by WESCA as "[a]ny device or apparatus, including, but not limited to, an induction coil or a telecommunication identification

interception device, that can be used to intercept a wire, electronic or oral communication[.]" 18 Pa.C.S. § 5702.

320.    "Electronic Communication" is defined as "[a]ny transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system." 18 Pa.C.S. § 5702.

321.    Tracking Pixels and Session Replay Code used by Defendants constitute a "device" used for the "acquisition of the contents of any wire, electronic, or oral communication" within the meaning of WESCA. Courts have held that software constitutes a "device" for purposes of applying wiretap statutes. *See, e.g.*, *Oliver v. Noom, Inc.*, No. 2:22-cv-1857, 2023 U.S. Dist. LEXIS 223965, at *18 (W.D. Pa. Aug. 22, 2023) ("[T]he class of technology contemplated by WESCA is broad.").

322.    The devices used to intercept the Website Communications of Plaintiffs also included personal computing devices, web browsers, browser-managed files, Internet cookies, Defendants' servers, third-party source code utilized by Defendants, and computer servers of third-parties.

323.    Plaintiffs' intercepted Website Communications constitute the "contents" of "electronic communication[s]" within the meaning of WESCA.

324.    Defendants intentionally enable Third-Party Vendors to procure and embed Tracking Pixels and Session Replay Code on the Website to intercept the Website users' interactions with the Website in real time.

325.    Plaintiffs did not consent to having their personal Website Communications wiretapped by Defendants.

326.    This conduct violates WESCA because Defendants knowingly enabled Third-Party Vendors to intercept the contents of Website Communications without user consent. By embedding Tracking Pixels and Session Replay Code on the Website, Defendants facilitated the covert interception and transmission of Plaintiffs' interactions with the Website—including keystrokes, clicks, and form submissions—to the Third-Party Vendors. These interactions constitute the "contents" of electronic communications under WESCA.

327.    Defendants' failure to clearly disclose this surveillance or obtain informed explicit consent from Plaintiffs renders these interceptions unlawful under WESCA.

328.    HIPAA's strict requirements for obtaining consent before disclosing PHI reinforce that Plaintiffs did not, and could not, consent under WESCA. As HIPAA mandates clear, written authorization before sharing PHI with third parties, and no such authorization was obtained here, any interception of the Plaintiffs' Website Communications by the Third-Party Vendors was unlawful under WESCA.

329.    Plaintiffs request the relief set forth in the Request for Relief below.

### <u>COUNT II – INVASION OF PRIVACY</u><br>(ON BEHALF OF PLAINTIFFS AND THE CLASS)

330.    Plaintiffs incorporate the preceding paragraphs as though fully realleged herein.

331.    Pennsylvania common law recognizes the tort of invasion of privacy.

332.    Plaintiffs have an objective, reasonable expectation of privacy in their Website Communications.

333.    Plaintiffs did not consent to, authorize, or know about Defendants' invasion of their privacy at the time it occurred.

334.    Plaintiffs have an objective interest in precluding the dissemination and/or misuse of their information and communications and in conducting their personal activities without intrusion or interference, including the right to not have their personal information intercepted and utilized for business gain.

335.    Defendants intentionally intruded on Plaintiffs' private life, seclusion, or solitude, without consent.

336.    Defendants' conduct is highly objectionable to a reasonable person and constitutes an egregious breach of the social norms underlying the right to privacy.

337.    Plaintiffs were harmed by Defendants' wrongful conduct as Defendants' conduct has caused Plaintiffs mental anguish and suffering arising from their loss of privacy and confidentiality of their electronic communications, specifically those relating to private and personal health information.

338.    Defendants' conduct has harmed Plaintiffs by capturing private and intimate personal facts, health information, and data in the form of their Website Communications.

339.    This disclosure and loss of privacy and confidentiality has caused Plaintiffs to experience mental anguish, emotional distress, worry, fear, and other harms.

340.    Further, Plaintiffs' private and personal health information has actual monetary value. By intercepting and profiting from Plaintiffs' personal and private information, Defendants have deprived Plaintiffs of the economic value of their data without providing proper consideration and have improperly profited from invading Plaintiffs' privacy.

341.    Defendants' HIPAA violations also support that Plaintiffs had a reasonable expectation of their health-related privacy. HIPAA sets strict regulations for protecting health-related data, and Defendants' unauthorized sharing of that data with third parties constituted an intentional intrusion into private affairs that would be highly offensive to a reasonable person.

342.    Plaintiffs request the relief set forth in the Request for Relief below.

## COUNT III – BREACH OF FIDUCIARY DUTY
### (ON BEHALF OF PLAINTIFFS AND THE CLASS)

343.    Plaintiffs incorporate the preceding paragraphs as though fully realleged herein.

344.    As a covered entity under HIPAA, Cigna had a fiduciary duty to maintain the confidentiality and privacy of Plaintiffs' personal health information, including the Website Communications made on Defendants' Website.[91]

---

[91] 145 C.F.R. § 164.502 (uses and disclosures of protected health information).

345.    As a business associate of a covered entity under HIPAA, CCS had a fiduciary duty to maintain the confidentiality and privacy of Plaintiffs' personal health information, including the Website Communications made on Defendants' Website.[92]

346.    Defendants likewise had a fiduciary duty, under Pennsylvania law, to ensure the confidentiality of patient data, including 28 Pa. Code. § 115.27, 28 Pa. Stat. § 7607, and 49 Pa. Code § 25.213(c), which mandate that medical records and patient data be treated as confidential unless explicit consent is given for disclosure.

347.    Defendants' fiduciary duty extended to ensuring that any collection, use, or sharing of personal health information was done only with the specific informed consent of the individual from whom the information was collected.[93]

348.    At all relevant times, a relationship existed between Plaintiffs and Defendants, in which Plaintiffs entrusted Defendants to protect the private and personal health information of Plaintiffs and members of the putative class, and Defendants accepted that trust.

349.    Defendants breached the fiduciary duty that it owed to Plaintiffs and the putative class by failing to act with the utmost good faith, fairness, and honesty, failing to act with the highest and finest loyalty, and failing to protect, or intentionally disclosing, this private and personal health information, while deliberately concealing their breaches from Plaintiffs.

---

[92] 145 C.F.R. § 164.502 (uses and disclosures of protected health information).
[93] *Id.*

350.    Defendants' actions in enabling the interception and transmission of Plaintiffs' sensitive health information without informed consent constitutes a breach of the fiduciary duty that Defendants owe Plaintiffs under Pennsylvania law.

351.    As a direct result of Defendants' actions, Plaintiffs have suffered harm, including but not limited to the unauthorized disclosure of their highly sensitive health information, the risk of identity theft, and other potential damage arising from the unauthorized collection and sharing of personal health data.

## COUNT IV – UNJUST ENRICHMENT
### (ON BEHALF OF PLAINTIFFS AND THE CLASS)

352.    Plaintiffs incorporate the preceding paragraphs as though fully realleged herein.

353.    Defendants obtained a significant financial benefit by covertly collecting, using, and sharing the personal health-related data of Plaintiffs with third parties, including the Third-Party Vendors, without consent.

354.    Defendants have been unjustly enriched by using this sensitive health information, which has enormous value, to generate profits through targeted advertising and the sale or use of the data by third parties, including the Third-Party Vendors.

355.    By collecting and transmitting this data without providing adequate notice or obtaining informed consent, Defendants have exploited the private health information of Plaintiffs for illicit financial gain, in violation of principles of fairness and equity.

356.    In contrast, Plaintiffs have suffered harm, including the loss of privacy and the potential for identity theft.

357.    Defendants' conduct is inequitable because it is unfair for a business associate of a covered entity, who owes a fiduciary duty to protect the privacy and confidentiality of patients' health data, to harvest and profit from that information without consent.

358.    The benefits that Defendants derived from Plaintiffs rightly belong to Plaintiffs as it is their private health information.

359.    It would be inequitable under unjust enrichment principles for Defendants to retain any of the profits or other benefits derived from the practices alleged in this Complaint.

360.    Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiffs all unlawful or inequitable proceeds received as a result of the conduct alleged in this Complaint.

## **REQUEST FOR RELIEF**

Plaintiffs, on behalf of themselves and the Class, request judgment against Defendants as follows:

A.  Certifying this case as a class action, appointing Plaintiffs as Class representatives, and appointing Plaintiffs' counsel as Class counsel;

B.  Finding that Defendants' conduct violates WESCA and Pennsylvania Common Law;

C.  Awarding actual damages caused by Defendants' violation of WESCA and Pennsylvania Common Law;

D.  Awarding statutory damages of not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher, pursuant to 18 Pa.C.S. § 5725(a);

E.  Awarding reasonable attorney's fees and other litigation costs, pursuant to 18 Pa.C.S. § 5725(a);

F.  Entering equitable relief enjoining Defendants from engaging in the misuse and/or disclosure of Plaintiffs' and Class members' data, and the issuance of prompt, complete and accurate disclosures to Plaintiffs, Class members, and all current and future users of the Website;

G.  Entering equitable relief requiring restitution and disgorgement of any profits wrongfully obtained as a result of Defendants' wrongful conduct;

H.  Awarding Plaintiffs and the Class  pre- and post-judgment interest, to the extent allowable; and

I.  Awarding such other and further relief as this Court deems appropriate and as equity and justice may require.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs, on behalf of themselves and the Class, request trial by jury of all claims asserted herein.

May 9, 2025                                    Respectfully submitted,

/s/ Nathan D. Stump
Jerome J. Schlichter (*pro hac vice*)
Andrew D. Schlichter (*pro hac vice*)
Alexander L. Braitberg (*pro hac vice*)
Nathan D. Stump (PA Bar No. 90169)
Chen Kasher (*pro hac vice*)
Sean M. Milford (*pro hac vice*)
Schlichter Bogard LLC
100 South Fourth Street, Suite 1200
St. Louis, MO 63102
(314) 621-6115
(314) 621-5934 (fax)
jschlichter@uselaws.com
aschlichter@uselaws.com
abraitberg@uselaws.com
nstump@uselaws.com
ckasher@uselaws.com
smilford@uselaws.com

*Lead Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 9th day of May 2025, a true and correct copy of

the foregoing document was filed via the Court's CM/ECF filing system and will be

available to all counsel of record upon their appearance.

<u>/s/ Nathan D. Stump</u>
Nathan D. Stump