**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JERRY M. ADAIR, CARLA DANIELSON, KATHERINE J. EMRICK, PRESTON PHAM, and EVA D. RECCHIA, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CIGNA CORPORATE SERVICES, LLC, and THE CIGNA GROUP,<br><br>Defendants. | Case No. 2:25-cv-02384 |

**DEFENDANTS CIGNA CORPORATE SERVICES, LLC AND THE CIGNA GROUP'S RESPONSE TO PLAINTIFFS' SUPPLEMENTAL BRIEF ON STANDING**

# TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. RELEVANT BACKGROUND .......... 3

A. Plaintiffs' Factual Allegations Do Not Describe Any Harm .......... 4

1. Plaintiffs allege they visited Cigna's public-facing webpages—but do not allege they entered any sensitive information on those pages. .......... 4

2. Plaintiffs allege they used the authenticated myCigna portal—but identify only Adobe, a HIPAA-compliant service provider. .......... 5

3. Plaintiffs never allege that any of *their* information was actually collected, transmitted, viewed, or misused. .......... 6

4. Plaintiffs' alleged harms are speculative, subjective, and unsupported. .......... 6

B. Plaintiffs Ignore Their Consent to Cigna's Use of Online Technologies and Mischaracterize Cigna's Interrogatory Responses .......... 7

III. THE STANDING REQUIREMENTS ARE WELL SETTLED .......... 9

IV. ARGUMENT .......... 11

A. Plaintiffs' Speculative Theory of Injury Fails Under *TransUnion* .......... 11

B. Any Alleged Disclosure Between Cigna and Its Vendors Is "Functionally Internal" Under *Barclift* and *Cook* .......... 13

C. Plaintiffs' Theories Fail Because They Are Not Analogous to Any Common Law Privacy Tort .......... 16

1. Plaintiffs Lack Standing Under a Public Disclosure Theory .......... 16

2. Plaintiffs Lack Standing Under an Intrusion Upon Seclusion Theory .......... 17

D. Plaintiffs' Case Law Is Inapposite and Cannot Overcome Binding Precedent .......... 19

E. Plaintiffs' Assertion of Standing based on Claims of Unjust Enrichment and Breach of Fiduciary Duty Fail .......... 22

F. Plaintiffs Also Lack Standing to Seek Injunctive Relief .......... 23

V. CONCLUSION .......... 24

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Fed'n of Teachers v. Bessent*,
152 F.4th 162 (4th Cir. 2025) ....20

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,
671 F.3d 140 (2d Cir. 2011) ....10

*Barclift v. Keystone Credit Services, LLC*,
93 F.4th 136 (3d Cir. 2024) .... *passim*

*Berger v. New York*,
388 U.S. 41 (1967)....19

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983)....23

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)....23, 24

*Cook v. GameStop, Inc.*
148 F.4th 153 (3d Cir. 2025) .... *passim*

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017) ....19

*Finkleman v. Nat'l Football League*,
810 F.3d 187 (3d Cir. 2016)....10

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000).... 9-10

*Garey v. James S. Farrin, P.C.*,
35 F.4th 917 (4th Cir. 2022) ....20

*In re Google Inc. Cookie Placement Consumer Priv. Litig.*,
934 F.3d 316 (3d Cir. 2016)....18

*Gubala v. Time Warner Cable, Inc.*,
846 F.3d 909 (7th Cir. 2017) ....19, 20

*In re Horizon Healthcare Servs. Data Breach Litig.*,
846 F.3d 625 (3d Cir. 2017)....19

*Jones v. Ford Motor Co.*,
85 F.4th 570 (9th Cir. 2023) ....................21

*Kline v. Sec. Guards, Inc.*,
386 F.3d 246 (3d Cir. 2004) ....................17

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)....................9

*Lupia v. Medicredit, Inc.*,
8 F.4th 1184 (10th Cir. 2021) ....................22

*Marcum v. Columbia Gas Transmission, LLC*,
423 F. Supp. 3d 115 (E.D. Pa. 2019) ....................23

*In re Nickelodeon Consumer Priv. Litig.*,
827 F.3d 262 (3d Cir. 2016)....................17, 18

*Perez v. McCreary, Veselka, Bragg & Allen, P.C.*,
45 F.4th 816 (5th Cir. 2022) ....................20

*Popa v. Microsoft Corp.*,
153 F.4th 784 (9th Cir. 2025) ....................21

*Salazar v. NBA*,
118 F.4th 533 (2d Cir. 2024) ....................22

*Salazar v. Paramount Global*,
133 F.4th 642 (6th Cir. 2025) ....................22

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021).................... *passim*

*Vernars v. Young*,
539 F.2d 966 (3d Cir. 1976)....................19

*Webb v. Injured Workers Pharmacy, LLC*,
72 F.4th 365 (1st Cir. 2023)....................22

*Yenchi v. Ameriprise Fin., Inc.*,
161 A.3d 811 (Pa. 2017) ....................23

*Zimmerman v. Highmark, Inc.*,
780 F. Supp. 3d 588 (W.D. Pa. 2025)....................23

**Other Authorities**

40 C.F.R. § 164.502 ....................5

Defendants Cigna Corporate Services, LLC and The Cigna Group (together, "Cigna") submit this brief in response to Plaintiffs' Supplemental Briefing Regarding Standing in Response to Order to Show Cause ("Response").

## I. INTRODUCTION

The Court directed Plaintiffs to "address the sufficiency of Plaintiffs' alleged harms through the lens of *TransUnion* . . . and its progeny." (ECF No. 49 n.1.) Plaintiffs' brief largely sidesteps the Court's instruction and does not meaningfully engage with the controlling framework. Instead, Plaintiffs devote nearly all of their submission to pre-*TransUnion* authorities, generalized privacy principles and mischaracterizations of their own allegations—while offering only the briefest, superficial references to *TransUnion*, *Barclift*, and *Cook*. Their failure to confront the binding precedent the Court identified is not incidental. It is dispositive.

The reason for Plaintiffs' analytical gaps is straightforward. Under the binding framework the Court directed the parties to apply, Plaintiffs' allegations do not describe a concrete injury. Plaintiffs allege only that they visited ***public-facing*** webpages that do not collect sensitive information, and that they later accessed the authenticated myCigna portal, where the only third-party tool they identify is Adobe—and they never allege that Adobe is operating in any way other than exclusively as Cigna's service provider under a HIPAA-compliant business associate agreement ("BAA"). Thus, the only alleged transmissions on the myCigna portal are to Cigna's own vendor acting within a closed, operational system to maintain website functionality, support user experience, and deliver Cigna's services. Under *Barclift* and *Cook*, such vendor-only communications are "functionally internal," not disclosures bearing any resemblance to the historically recognized privacy harms required for Article III. And even if Plaintiffs could plausibly allege that sensitive information theoretically could have been transmitted, they do not allege that any of ***their own*** information was actually collected, viewed,

misused, or resulted in any real-world consequence. Instead, they rely solely on generalized notions of "loss of privacy," "embarrassment," and increased "vulnerability"—precisely the speculative, risk-based theories that *TransUnion* holds insufficient as a matter of law.

These allegations explain why Plaintiffs had so little to say about *TransUnion*. Although they cite it, they never grapple with its core holdings: (1) a statutory violation is not a concrete injury; (2) speculative risk is insufficient in a damages action; and (3) a plaintiff must plausibly allege a real-world harm with a close relationship to a historically recognized privacy injury. Plaintiffs instead assert, without analysis, that any "unauthorized disclosure" is inherently concrete—precisely the logic *TransUnion* rejects.

Their treatment of *Barclift* follows the same pattern. Plaintiffs mention the decision only to assert that it is "distinguishable," while ignoring its central reasoning: that vendor-only transmissions—even if unintended—are not analogous to the publicity-based harms underlying the common-law privacy torts that define Article III boundaries. *Barclift* forecloses reliance on "internal" or ministerial disclosures. Plaintiffs do not address this holding because it eliminates their theory.

And Plaintiffs' attempt to address *Cook* is even more superficial. *Cook* is the Third Circuit's most relevant precedent, addressing the very same categories of online tools at issue here. Plaintiffs avoid its controlling principles: that routine website analytic tools do not intrude upon seclusion, do not publicly disclose private facts, and do not create Article III injury. Plaintiffs instead selectively isolate immaterial factual differences while declining to engage with the governing rule *Cook* applies.

The fundamental flaw across Plaintiffs' authorities and allegations is the same: they offer neither factual allegations nor legal analysis that can satisfy the framework this Court required.

They do not allege what information about them was collected, to whom it was disclosed, how it was used, or any real-world consequence. Their theories rest entirely on what *could* have happened—not what did. Plaintiffs offer only generalized assertions of "loss of privacy" and speculative risk—none of which constitutes an injury in fact under binding precedent

Under *TransUnion*, *Barclift*, and *Cook*, Plaintiffs have not alleged injury in fact. Their claims must be dismissed.

## II. RELEVANT BACKGROUND

Plaintiffs are five individuals enrolled in Cigna health plans and who used Cigna's online platforms to varying degrees between May 2023 and the present. (ECF No. 31 ("FAC") ¶¶ 23-27.) Their allegations rest on the premise that Cigna used certain website analytic and web enhancement technologies (the "Online Technologies") on its public-facing websites and within the authenticated myCigna portal. These tools are expressly disclosed in Cigna's online privacy policy, the Website Privacy Notice ("Privacy Notice"), which appears on each of Cigna's webpages at issue and to which, as Plaintiffs concede, all members agree. (*Id.* ¶¶ 171-289; ECF No. 45 ("MTD") §§ II.B, IV.B.)

The Online Technologies identified in the FAC are industry-standard mechanisms used to improve website functionality, measure performance, and support member experience. Plaintiffs do not allege that these tools collected their sensitive information from Cigna's public webpages, nor do they allege that the only tool identified within the authenticated environment—Adobe—operated as anything other than Cigna's service provider under a HIPAA-compliant BAA. Despite the breadth of their legal theories, Plaintiffs' factual allegations are narrow. They do not allege that any Online Technology captured information about ***them*** personally; that any data associated with ***them*** was viewed, misused, reidentified, or disseminated beyond Cigna's

vendors; or that ***they*** experienced any real-world consequence resulting from the alleged deployment of these tools. (*See generally* FAC.)

**A. Plaintiffs' Factual Allegations Do Not Describe Any Harm**

Plaintiff's Response reframes the alleged harm in the FAC, asserting that "[t]he unauthorized disclose [sic] of *private* information is an injury in fact." (Resp. at 1.) The FAC makes broad references to generic categories of harm that Plaintiffs claim, including "loss of privacy, embarrassment, and greatly increased vulnerability to identity theft and fraud." (FAC ¶ 20.) Plaintiffs' Response, however, attempts to collapse the inquiry into a single premise: that the mere allegation of "disclosure" itself satisfies Article III. (Resp. at 7 ("[C]ourts universally recognize that a defendant's unauthorized disclosure of private information causes an 'injury in fact.'").) But Plaintiffs never allege that any disclosure of ***their*** information actually occurred. Instead, their theory rests on a two-step chain of inferences that do not intersect: (1) they interacted with certain Cigna-hosted webpages (FAC ¶¶ 23-27, 283-89); and (2) Cigna deployed Online Technologies on certain webpages, but not necessarily those that Plaintiffs used, that ***could*** have captured Plaintiffs' unidentified "private" information (*id.* ¶¶ 177-282). Neither step is supported by factual allegations establishing injury in fact.

**1. Plaintiffs allege they visited Cigna's public-facing webpages—but do not allege they entered any sensitive information on those pages.**

The allegations regarding the five Plaintiffs' own use of Cigna's public webpages are confined to 12 paragraphs. (*Id.* ¶¶ 23-27, 283-89.) They claim only that they "used and continue[] to use [Cigna's] Website regularly" (*id.* ¶ 24), but they identify no specific interaction with the public-facing webpages—www.cigna.com, plans.cigna.com, or the Knowledge Center—in which they entered personal, health-related, or otherwise sensitive information. Rather, the public-facing webpages they challenge are alleged to deploy only cookies that collect

non-sensitive browsing metadata, such as URL visited, operating system, browser type, date and time stamps, and similar functional information. (*Id.* ¶ 5, Figs. 3-17.) Plaintiffs do not allege that these public-facing tools collected diagnoses, treatments, prescriptions, payment information, or anything capable of identifying them individually. (*See generally* FAC.) This is the first fatal gap: Plaintiffs do not allege that they provided ***any*** sensitive information on the public-facing webpages where the Online Technologies were allegedly deployed.

**2. Plaintiffs allege they used the authenticated myCigna portal—but identify only Adobe, a HIPAA-compliant service provider.**

Plaintiffs next allege that inside the authenticated portal, Cigna embedded one tool: Adobe Analytics, operating under the "smetrics.cigna.com" domain. Plaintiffs concede myCigna is a password-protected environment (*Id.* ¶ 174) and acknowledge that smetrics.cigna.com is Adobe's Cigna-specific domain (*id.* ¶¶ 269, 271-72), and they never allege that Adobe was used outside of a HIPAA-compliant BAA. That omission is significant—Plaintiffs never allege that Adobe functions as anything but a service provider assisting Cigna with the operational tasks necessary to maintain and improve the portal, including site functionality, performance measurement, and user experience.

Plaintiffs do not allege that Adobe acted outside its contractual role, transmitted information beyond Cigna's systems, or received identifiable protected health information ("PHI") in a manner inconsistent with HIPAA's authorization for business associates. *See* 40 C.F.R. § 164.502 (authorizing disclosures of HIPAA-protected information to business associates). Plaintiffs ***never*** allege that Adobe misused or even accessed Plaintiffs' data. At most, Plaintiffs describe ordinary communications between Cigna and a vendor that helps Cigna deliver its services—communications that support the site's functionality and consumer experience, not communications that expose private information to outsiders. Plaintiffs'

allegations around Cigna's use of Adobe are precisely the type of internal, service-supporting activities that HIPAA contemplates and permits, and that Plaintiffs themselves agreed to through Cigna's disclosures.

This is the second fatal gap: even where Plaintiffs identify a tool in the authenticated environment, their own allegations describe nothing more than functionally internal, service-provider communications.

**3. Plaintiffs never allege that any of *their* information was actually collected, transmitted, viewed, or misused.**

Even accepting Plaintiffs' allegations at face value, they never allege that any information about ***them personally*** was actually intercepted, tied to their identities, disclosed to anyone other than Cigna's service provider, or used for advertising, profiling, or any other downstream effect. Instead, Plaintiffs rely on hypothetical constructions. For example, Plaintiffs assert that "[w]hen insureds ***like*** Plaintiffs search for medical conditions . . . their searches are transmitted to Adobe" (FAC ¶ 273 (emphasis added)), or that Adobe ***could*** transmit information when "insureds ***like*** Plaintiffs" perform certain searches (*id.* ¶ 269 (emphasis added)). None of these allegations asserts that these Plaintiffs themselves searched for any medical condition, that any such search was captured, or that any of their data allegedly entered within the portal was transmitted outside the HIPAA-compliant, service-provider relationship governed by the BAA. And they never once allege that they saw or received an advertisement based on their use of Cigna's webpages. This is the third fatal gap: Plaintiffs do not allege that ***any sensitive information belonging to them*** was ever collected or shared at all.

**4. Plaintiffs' alleged harms are speculative, subjective, and unsupported.**

Finally, even the harms Plaintiffs claim to have suffered are entirely abstract. The FAC alleges only "embarrassment" (*Id.* ¶ 20), "loss of privacy," and "mental anguish, emotional

distress, worry, [and] fear" (*id.* ¶ 405), along with a generalized "risk of identity theft" (*id.* ¶ 417). None of these assertions is tied to any alleged disclosure of Plaintiffs' information, to any identified misuse of their data, or to any outcome flowing from the Online Technologies they challenge. Plaintiffs thus describe subjective reactions to hypothetical possibilities, not concrete, real-world injuries. Plaintiffs' inability to connect their claimed harms to any actual disclosure or consequence underscores yet another fundamental deficiency in their theory of injury.

### B. Plaintiffs Ignore Their Consent to Cigna's Use of Online Technologies and Mischaracterize Cigna's Interrogatory Responses

Plaintiffs also disregard their own consent to Cigna's disclosed use of Online Technologies and mischaracterize Cigna's interrogatory responses in an effort to manufacture an unauthorized disclosure that their own pleadings do not support. Their selective quotations from Cigna's responses distort the allegations before the Court and cannot cure the absence of any factual allegation that Cigna disclosed information from the myCigna portal to anyone outside a HIPAA-compliant, service-provider relationship.

Plaintiffs' mischaracterization is evident in their reliance on Cigna's interrogatory responses to suggest that Cigna's general website practices establish a concrete injury. (*E.g.*, Resp. at 3 n.1.) The first interrogatory Plaintiffs cite asked Cigna to "[i]dentify all information that ***Your Website*** collects from visitors." (ECF No. 50-2 at 9 (emphasis added).) In response, Cigna referred Plaintiffs to its disclosures in its Privacy Notice, which notifies users of categories of information that Cigna ***may*** collect about visitors as they engage with Cigna's services across the various webpages of its website. (*See id.*; *see also* ECF No. 45-6 at 3 (a copy of Cigna's Privacy Notice, disclosing information Cigna may collect from users).) But as Cigna explained in the interrogatory response—and Plaintiffs omit from their submission—the list of information

"is ***not*** necessarily representative of what the ***Online Technologies*** at issue in this litigation collect." (ECF No. 50-2 at 9 (emphasis added).)

Plaintiffs' argument conflates two entirely different concepts: (1) the general categories of information that Cigna's website may be capable of collecting, and (2) the narrower, directly relevant question of what the Online Technologies allegedly collected from ***these Plaintiffs***. Plaintiffs supply no factual allegation bridging that gap. By presenting these generalized data categories as though they reflect actual collection by the Online Technologies, Plaintiffs attempt to convert a disclosure about an entire website, untethered to Plaintiffs' experiences, into an allegation of concrete injury. This does not satisfy Plaintiffs' burden.

It has never been a secret that Cigna uses certain Online Technologies for website analytics and to improve its user experiences. Plaintiffs concede that Cigna disclosed in its Privacy Notice the use of Online Technologies and that it partners with third-party vendors to do so. (FAC ¶¶ 48, 310-15, Fig. 28; *see also* ECF No. 45-6 at 6 (discussing Cigna's use of "Cookies and Other Tracking Technologies").) Plaintiffs likewise do not dispute that Cigna's HIPAA Notice of Privacy Practices ("HIPPA Notice") informs users that business associates, such as Adobe, may provide services to Cigna and may receive PHI in the ordinary course of doing so. (*See* ECF No. 45-9 at 2.) And Plaintiffs expressly allege that they were on notice of—and agreed to—these disclosures when creating their myCigna accounts to access the authenticated portal. (FAC ¶¶ 283-89.) They also do not contest that Cigna's Privacy Notice and HIPAA Notice appear in the footer of all of Cigna's webpages at issue, consistent with industry standard. (*Id.* ¶¶ 304, 308; *see also* ECF No. 45-2.)

This is all consistent with the interrogatory responses Plaintiffs selectively quote to support their theory of harm. Plaintiffs quote Cigna's response on its use of Online Technologies

(Resp. at 3 n.2) but omit the full text of Cigna's response that states that "Adobe technology is deployed within the authenticated myCigna website pursuant to the terms of the governing Business Associate Agreement." (ECF No. 50-2 at 7.) Similarly, Plaintiffs try to suggest that they have asserted injury in fact by stating that Cigna uses Online Technologies for "supporting marketing and advertising" (Resp. at 5), but that use case is disclosed in Cigna's Privacy Notice—along with the many non-marketing uses for Online Technologies—and the language Plaintiffs quote from Cigna's interrogatory response makes clear that the response is describing the disclosures "in the governing Website Privacy Notice." (ECF No. 50-2 at 8.)

Plaintiffs do not allege that anything occurred outside the scope of these clear and conspicuous disclosures. Nor do they allege facts contradicting Cigna's statement that its website provides a "secure and confidential digital experience." (FAC ¶ 290; Resp. at 5.) Nothing in the FAC suggests that any information from within the portal was disclosed outside a HIPAA-compliant business associate relationship, or that Adobe—or any other vendor—used ***Plaintiffs'*** information for any purposes beyond the services Cigna disclosed and Plaintiffs accepted.

In short, Plaintiffs were on notice of and consented to the conduct at issue. Their effort to manufacture injury in fact by mischaracterizing Cigna's interrogatory responses does not transform disclosed, service-provider communications into an unauthorized disclosure of sensitive information. It cannot supply the missing allegation of concrete harm or actual injury that Article III requires.

## III. THE STANDING REQUIREMENTS ARE WELL SETTLED

Plaintiffs alone bear the burden of establishing Article III standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). They cannot meet that burden with generalized or conclusory allegations. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,

528 U.S. 167, 184 (2000). "Thus, to survive a motion to dismiss for lack of standing a plaintiff 'must allege facts that affirmatively and plausibly suggest that it has standing to sue.'" *Finkleman v. Nat'l Football League*, 810 F.3d 187, 194 (3d Cir. 2016) (quoting *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011)). This requires factual allegations establishing, beyond redressability, "an injury in fact that is concrete, particularized, and actual or imminent" and "that the injury was likely caused by the defendant." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). And where, as here, Plaintiffs seek damages on behalf of a putative class, "[e]very class member must have Article III standing in order to recover individual damages." *Id.* at 431.

The Supreme Court and the Third Circuit have articulated a cohesive framework for determining when an intangible privacy-based injury is sufficiently concrete. *TransUnion* confirms that a statutory violation or abstract privacy interest alone is not an injury in fact; a plaintiff must show a real-world harm or one with a "close relationship" to a traditionally recognized tort. *Id.* at 424, 426-27. The Third Circuit has applied that mandate in the contexts at issue here. In *Barclift v. Keystone Credit Services, LLC*, the court held that vendor-only or ministerial transmissions are "functionally internal" and therefore do not resemble the publication-based harms underlying the tort of public disclosure of private facts. 93 F.4th 136, 146 (3d Cir. 2024). And in *Cook v. GameStop, Inc.*, the court reaffirmed that ordinary website interactions and the routine capture of browsing data do not constitute the type of highly offensive intrusion required for intrusion-upon-seclusion analogues, and that nonpublic, vendor-only transmissions likewise do not create a concrete injury. 148 F.4th 153, 159-60 (3d Cir. 2025).

Taken together, these decisions establish that where a plaintiff alleges a nonphysical

privacy harm, standing requires: (1) an actual disclosure or intrusion; (2) to someone other than a service provider or internal intermediary; (3) that results in a harm with a close relationship to a traditionally recognized tort.

These decisions supply the controlling legal standards against which Plaintiffs' allegations must be assessed—standards that Plaintiffs do not meaningfully engage with in their submission.

## IV. ARGUMENT

Plaintiffs' allegations do not satisfy the controlling legal framework set forth in *TransUnion*, *Barclift*, and *Cook*. Plaintiffs' briefing suffers from multiple, compounding deficiencies. They do not confront the binding precedent this Court expressly directed them to apply. They identify no concrete harm alleged in the FAC—no disclosure, no intrusion, no misuse, and no real-world consequence. Their submission instead rests on speculation about what the Online Technologies ***might*** have captured, abstract assertions of privacy interest, and a misreading of Cigna's interrogatory responses that attempts to manufacture an "unauthorized disclosure" where their own pleadings allege none. Under the standards established by the Supreme Court and the Third Circuit, Plaintiffs' theory of injury fails to satisfy Article III on the face of the pleadings.

### A. Plaintiffs' Speculative Theory of Injury Fails Under *TransUnion*

Article III requires a concrete, real-world injury—one that bears a close relationship to harms long recognized at common law. *TransUnion* involved Office of Foreign Assets Control ("OFAC") alerts in consumers' credit files indicating that their names purportedly matched those of terrorists, drug traffickers, and other serious criminals. 594 U.S. at 420-21. The Court divided the class into two groups: (1) members whose files with OFAC alerts were disseminated to third parties, and (2) members whose files were never disseminated. *Id.* at 421-22. Only the

first group had standing, because dissemination of stigmatizing falsehoods to third parties closely resembled the traditionally recognized harm of defamation. The second group—whose files remained internal—lacked standing even though their files contained the same inaccurate and potentially damaging information. *Id.* at 433-34, 437-39.

From this, the Supreme Court drew two clear principles. ***First***, "an injury in law is not an injury in fact": a statutory violation alone does not confer standing. *Id.* at 426-27. ***Second***, "the mere risk of future harm, standing alone, cannot qualify as a concrete harm" in a suit for damages. *Id.* at 436. Plaintiffs must allege an actual, concrete injury that bears a "close relationship" to a historically recognized harm. *Id.* at 424.

Measured against *TransUnion*, Plaintiffs' allegations fall far short. They do not allege that any information about them was actually disseminated to anyone outside of Cigna's HIPAA-governed service-provider relationships. They cannot identify what "private" information was supposedly captured, to whom it was sent, how it was used, or what consequence followed. Plaintiffs' allegations are weaker even than the claims of the *TransUnion* class members whose files contained inaccurate OFAC alerts but were never disseminated—allegations of injury the Supreme Court held insufficient under Article III as a matter of law.

Plaintiffs attempt to align themselves with the *TransUnion* class members whose information was disseminated, arguing that their asserted harm is analogous to a "disclosure of private information." (Resp. 9.) That misreads the decision. Those class members had standing because (i) their information was ***actually*** disclosed to third parties, (ii) the information was false or misleading, and (iii) the publication branded them as potential terrorists or serious criminals, causing reputational injury akin to defamation. *TransUnion*, 594 U.S. at 432-33. None of those elements is present here.

Instead, Plaintiffs rely on abstract harms: "loss of privacy," "embarrassment," "worry," "fear," and an alleged "increased vulnerability to identity theft and fraud." (FAC ¶¶ 20, 405, 417.) But *TransUnion* squarely forecloses reliance on such risk-based and speculative harms in a suit for damages. *TransUnion*, 594 U.S. at 436-37. Plaintiffs do not allege that any such harm materialized in the real world. Under *TransUnion*, their asserted "injury" is precisely the type of legal, theoretical harm that cannot satisfy Article III.

Plaintiffs' reliance on Cigna's interrogatory responses does not alter this analysis. The interrogatory they cite sought identification of the types of information the website may collect in general, and Cigna referred them to its Privacy Notice with the express clarification that those categories are ***not*** necessarily representative of what the specific Online Technologies at issue collect—let alone that the Technologies collected the information ***from Plaintiffs***. (*See* ECF No. 50-2 at 9.) Plaintiffs nonetheless recast these generalized categories as admissions that the Online Technologies intercepted and disclosed sensitive information about them. Plaintiffs' mischaracterization of interrogatory responses does not save their bare statutory theory and does not supply the concrete, real-world injury that *TransUnion* requires.

### B. Any Alleged Disclosure Between Cigna and Its Vendors Is "Functionally Internal" Under *Barclift* and *Cook*

Even if Plaintiffs could plausibly allege that data moved between Cigna and its vendors, that would still be insufficient under *Barclift* and *Cook*, which treat such vendor-only transmissions as "functionally internal" and not analogous to the common-law privacy harms they invoke.

In *Barclift*, the plaintiff alleged that a debt collector unlawfully shared her personal information with a third-party mail vendor, causing "embarrassment and stress," invading her privacy, and inflicting reputational harm. 93 F.4th at 140-41. Applying *TransUnion*, the Third

Circuit adopted a "kind-of-harm" test and examined whether the alleged injury resembled the tort of public disclosure of private facts. *Id.* at 142, 145. It held that it did not, because the plaintiff alleged only that her data was transmitted to "a single ministerial intermediary," and she did not allege that "anyone outside of [the defendant] or [its vendor had] accessed her personal information." *Id.* at 146. Vendor-only transmissions, the court concluded, are "functionally internal" and do not bear a sufficiently close relationship to any traditionally recognized publication-based tort. *Id.* at 145-47.

Plaintiffs' allegations here are even weaker. They do not allege that any information was disseminated beyond Cigna and its Online Technology vendors. Their invocation of Cigna's interrogatory responses only confirms that point: at most, those responses describe the types of information Cigna's website may collect in the ordinary course, not any disclosure of Plaintiffs' information beyond "functionally internal" service providers of the kind *Barclift* and *Cook* hold insufficient. To the extent Plaintiffs identify any "transmission" at all, it is a transmission from Cigna's webpages to analytics providers operating in a service-provider capacity—precisely the sort of "ministerial intermediary" relationship *Barclift* describes.

Plaintiffs do not claim that any person outside Cigna or those vendors accessed their information, that the data was republished, or that it reached any broader audience capable of causing humiliation or reputational harm—they do not even allege that they themselves saw an advertisement stemming from their interactions with Cigna's webpages. (*See generally* FAC.) As *Barclift* explains, a vendor-only transmission "is not the same kind of harm as *public* disclosure of private facts, which is concerned with highly offensive information being widely known." 93 F.4th at 146 (emphasis in original) (citation omitted).

*Cook* reinforces the same conclusion in the context on website analytics. There, the plaintiff alleged that session replay code on a retailer's site tracked her mouse movements, clicks, keystrokes, and URLs visited, and sent that data to Microsoft on a third-party server. 148 F.4th at 156. The Third Circuit nonetheless found no injury in fact in part because the information was sent only to Microsoft—a single vendor—not to the general public. *Id.* at 159-60. A vendor-only transmission of browsing data, the court held, is not comparable to public disclosure and does not create a concrete Article III injury. *Id.*

The same is true here. Plaintiffs allege at most that URLs, search queries, clickstream data, and device identifiers (FAC ¶¶ 7, 15, 118, 177, 185-86, 211, 277) were automatically transmitted to Online Technology providers. (*Id.* ¶ 334.) They do not allege that these data were ever publicized or otherwise made known beyond these vendors or that any information allegedly captured from the authenticated portal was disclosed outside of a HIPAA-compliant BAA. (*See id*. ¶¶ 283-89.) Indeed, Cigna's Privacy Notice expressly discloses that Cigna partners with Online Technologies "to provide, customize, evaluate, and improve [Cigna's] Services" and "to manage our advertising on third-party Websites." (ECF No. 45-6 at 7-8.) And its HIPAA Notice discloses the use of business associates to "help us operate more efficiently." (ECF No. 45-9 at 2.) These are the quintessential "functionally internal" relationships *Barclift* describes, 93 F.4th at 145, and *Cook* reinforces, 148 F.4th at 159-60.

Because Plaintiffs cannot point to any actual harm from these functionally internal transmissions, they fall back on speculative harms such as embarrassment and fear of identity theft. (FAC ¶ 20.) But *Barclift*—echoing *TransUnion*—rejects such risk-of-future-harm theories as insufficient in a damages case: a plaintiff "must show that she was 'independently

harmed by [her] exposure to the risk itself.'" 93 F.4th at 147-48 (quoting *TransUnion*, 594 U.S. at 437). Plaintiffs allege no such independent harm.

Under *Barclift* and *Cook*, "functionally internal" transmissions—whether to a print vendor, a session replay provider, or an Online Technology vendor—do not create Article III injury as a matter of law. Absent more, Plaintiffs cannot establish standing.

### C. Plaintiffs' Theories Fail Because They Are Not Analogous to Any Common Law Privacy Tort

Under *TransUnion*, Plaintiffs must show that any alleged intangible harm bears a "close relationship" to harm traditionally recognized at common law. 594 U.S. at 424. Plaintiffs' theory relies on two such privacy-based harms—public disclosure of private facts and intrusion upon seclusion—but their allegations do not meet the requirements of either doctrine. And although the Court expressly directed Plaintiffs to analyze their alleged harms through this common-law framework, their submission does not undertake that analysis at all.

#### 1. Plaintiffs Lack Standing Under a Public Disclosure Theory

On a public disclosure theory, *Cook* is dispositive. The plaintiff in *Cook* asserted that session replay code captured her mouse clicks, URLs, search terms, and device/browser information on a public website and disclosed them to Microsoft, a third-party vendor. 148 F.4th at 156. She argued that this was analogous to the tort of public disclosure of private facts. *Id.* at 159-60. The Third Circuit disagreed for two independent reasons: (1) the information captured was not sensitive, personal, or humiliating; and (2) "even assuming the information was the type that could cause [plaintiff] humiliation under 'public scrutiny,' the information was never publicized or even publicly disclosed. [Her] allegations concern disclosure of information to Microsoft, a third-party vendor to [defendant], not the broader public." *Id.* at 160 (internal citation omitted). The court concluded that such vendor-only transmission is "not analogous to

the harm associated with the tort of disclosure of private information" and therefore not a concrete injury. *Id.*

That holding forecloses Plaintiffs' theory here. As in *Cook*, Plaintiffs allege at most that Online Technologies captured URLs, search terms, and other routine web-browsing data on public webpages or from within an authenticated portal under a BAA and transmitted it to vendors pursuant to Cigna's disclosed policies. (FAC ¶¶ 7, 15, 118, 177, 185-86, 211, 277, 334.) They do not allege that any information about them was made public, widely disseminated, or exposed in a way that could generate humiliation or reputational harm. Under *Cook* and *Barclift*, such allegations are not analogous to public disclosure of private facts and do not constitute injury in fact.

**2. Plaintiffs Lack Standing Under an Intrusion Upon Seclusion Theory**

Plaintiffs fare no better under an intrusion-upon-seclusion theory. The Third Circuit has defined intrusion upon seclusion as an intentional intrusion "upon the solitude or seclusion of another or his private affairs or concerns" that would be "highly offensive to a reasonable person." *Cook*, 148 F.4th at 160 (quoting *Kline v. Sec. Guards, Inc.*, 386 F.3d 246, 260 (3d Cir. 2004)). In *Cook*, the court stressed two principles relevant here (1) the harm is the intrusion itself into a private sphere, and (2) a plaintiff's expectation of privacy is constrained by the inherent nature of internet browsing, which the court made clear is not categorically private. 148 F.4th at 160-61.

Applying those principles, *Cook* held that a shopper entering non-sensitive search terms on a public retail website could not "plausibly allege that there was an intrusion of her solitude or seclusion as to her person or private affairs," particularly where the website operator had not promised not to collect such data. *Id.* at 160. The absence of any broken promise or misrepresentation about data collection was a key factor distinguishing earlier cases like *In re*

*Nickelodeon Consumer Privacy Litigation*, 827 F.3d 262 (3d Cir. 2019), and *In re Google Inc. Cookie Placement Consumer Privacy Litigation*, 934 F.3d 316 (3d Cir. 2016). *See Cook*, 148 F.4th at 162.

The same is true here. Plaintiffs' allegations regarding seven of the eight Online Technologies are limited to interactions with Cigna's public-facing webpages. (FAC ¶¶ 5, 172, 173, 209, 230, 246, 254, 262-63.) Those pages are no different from the commercial retail webpage at issue in *Cook*: publicly accessible, used for general browsing, and devoid of any allegation that Plaintiffs entered intimate or sensitive information (or even that they could). (*See id*. ¶ 305.) On these public webpages, there is plainly no "intrusion" into solitude or private affairs by the use of commonplace Online Technologies.

Within the authenticated portal, Plaintiffs' intrusion theory is also flawed. Cigna disclosed in advance, though its Privacy Notice and HIPAA Notice that it uses Online Technology vendors and partners with HIPAA-compliant business associates to help operate, customize, and improve its services. (*Id*. ¶¶ 48, 310-15, Fig. 28; *see also* ECF No. 45-6 at 6; ECF No. 45-9 at 2.) By logging into the authenticated portal, Plaintiffs concede that they were on notice of and agreed to Cigna's Privacy Notice and HIPAA Notice. (FAC ¶¶ 283-89.) That makes this case more like *Cook* than *Nickelodeon* or *Google*: Plaintiffs do not allege that Cigna made any promises not to collect the type of data at issue or that Cigna violated any representation about how the portal operates.

At bottom, Plaintiffs allege only ordinary web interactions with an insurer's public website and member portal. They do not allege that the Online Technologies captured their diagnoses, treatment details, or other intimate medical facts through the public pages (or again, that such information even exists on those pages); that any vendor "looked over their shoulders"

in a manner invading solitude; or that Cigna engaged in conduct that would be "highly offensive" to a reasonable person. *Cook*, 148 F.4th at 160. Plaintiffs have not alleged an intrusion at all, let alone a concrete injury in fact sufficient to satisfy Article III.

### D. Plaintiffs' Case Law Is Inapposite and Cannot Overcome Binding Precedent

Rather than engage with the binding precedent this Court directed them to apply, Plaintiffs rely on a collection of cases that do not control the Article III inquiry and, in several instances, affirmatively undermine their position. (*Contra* Resp. at 8-10.) Many of the cases cited predate *TransUnion* and therefore cannot address the dispositive requirement that an alleged intangible harm bear a close relationship to a traditionally recognized tort. *See, e.g.*, *Berger v. New York*, 388 U.S. 41 (1967); *Vernars v. Young*, 539 F.2d 966 (3d Cir. 1976); *Gubala v. Time Warner Cable, Inc.*, 846 F.3d 909 (7th Cir. 2017); *Eichenberger v. ESPN, Inc.*, 876 F.3d 979 (9th Cir. 2017); *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 827 F.3d 262 (3d Cir. 2016); *In re Horizon Healthcare Servs. Data Breach Litig.*, 846 F.3d 625 (3d Cir. 2017). These decisions do not provide the *TransUnion* analysis the Court expressly required.

Plaintiffs' other cited authority fares no better.

- ***Gubala v. Time Warner Cable, Inc*. confirms that a lack of disclosure defeats standing**. In *Gubala*—decided even before *TransUnion*—the Seventh Circuit held that the plaintiff lacked Article III standing precisely because no disclosure occurred. 846 F.3d at 911-13. Contrary to Plaintiffs' assertion, *Gubala* does ***not*** stand for the proposition that "the dissemination to a third party of information in which a person has a right to privacy is a sufficiently concrete injury for standing purposes." (*Contra* Resp. at 10.) Rather, the Seventh Circuit held the opposite: because there was no allegation that the allegedly unlawfully retained data had been leaked, caused harm, or was even at risk of being stolen, there was no injury in fact. 846 F.3d at 910-13. The same defect exists

here. Plaintiffs do not allege that their information was exposed beyond the Cigna or Online Technology providers' systems. Thus, under *Gubala*, they have not pled an Article III injury, "as otherwise the federal courts would be flooded with cases based not on proof of harm but on an implausible and at worst trivial risk of harm." *Id.* at 911.

- ***Perez v. McCreary, Veselka, Bragg & Allen, P.C.* underscores that statutory violations and hypothetical harms are insufficient**. In *Perez*, the Fifth Circuit rejected multiple theories of injury arising from an allegedly misleading collection letter, holding that a bare statutory violation, a speculative risk of financial harm, confusion, the time spent consulting counsel, and receipt of an unwanted letter are all insufficient to establish Article III standing. 45 F.4th 816, 823-26 (5th Cir. 2022). Plaintiffs' allegations here are even weaker: they do not claim that any information about them was publicized, viewed, misused, capable of identifying them, or that they suffered public embarrassment, reputational harm, or financial loss. Nor do they allege that any supposed risk ever materialized. Without concrete personal injury, they cannot meet Article III's requirements.

- ***Garey v. James S. Farrin, P.C.* confirms that standing requires downstream harm**. In *Garey*, the plaintiffs established a concrete injury only because defendants obtained their information "for an impermissible purpose" and they actually received unwanted advertising as a result of the alleged privacy violation. 35 F.4th 917, 920-22 (4th Cir. 2022). The Fourth Circuit has since clarified that without such a downstream consequence, "the plaintiffs in *Garey* would have suffered no harm akin to intrusion upon seclusion." *Am. Fed'n of Teachers v. Bessent*, 152 F.4th 162, 173 (4th Cir. 2025). Plaintiffs here allege no comparable downstream impact: no advertisements, no

targeting, no denial of services, and no reputational fallout. Their FAC does not allege any harmful consequence occurring after Cigna's service providers allegedly received information (or if those vendors even received ***Plaintiffs'*** information). Absent any downstream harm, or even an impermissible purpose, their theory presents nothing more than an injury in law, which is insufficient under *TransUnion* and its progeny.

Plaintiff's reliance on *Jones v. Ford Motor Co.* is misplaced. 85 F.4th 570 (9th Cir. 2023). To start, *Jones* does not cite *TransUnion* at all, nor does it reference *Cook*, *Barclift*, or any other post-*TransUnion* authority—precisely the framework this Court directed the parties to apply. As relevant here, *Jones* held only that the plaintiffs had plausibly alleged Article III standing because the Washington Privacy Act creates a substantive privacy right, and the complaint alleged a violation of that statutory entitlement. *Id.* at 574. The Ninth Circuit has since confirmed that this reasoning does not extend to procedural wiretap statutes like WESCA. In *Popa v. Microsoft Corp.*, the court applied *TransUnion* to WESCA and held that a procedural violation does not confer Article III standing absent a historically grounded analogue for the alleged harm and affirmed dismissal for lack of standing because, just as the Third Circuit has concluded, there is no concrete harm when public websites are at issue. 153 F.4th 784, 791 (9th Cir. 2025) (concluding that the use of session replay technology is not "highly offensive" and "the monitoring of [plaintiff's] interactions with [defendant's] website seems most similar to a store clerk's observing shoppers in order to identify aisles that are particularly popular or to spot problems that disrupt potential sales"). Plaintiffs' claims here—like those rejected in *Popa*—assert only bare statutory wiretap violations, with no concrete, real-world injury.

The remainder of Plaintiffs' cited authorities fare no better, as they involve wholly inapposite contexts.

- *Webb v. Injured Workers Pharmacy, LLC* involved a data breach in which cybercriminals infiltrated a pharmacy's systems, stole Social Security numbers, and used them to file fraudulent tax returns. 72 F.4th 365 (1st Cir. 2023).
- *Lupia v. Medicredit, Inc.* concerned a debt collector's unwanted call placed after the plaintiff sent the defendant a cease-and-desist letter. 8 F.4th 1184 (10th Cir. 2021).
- *Salazar v. NBA*, 118 F.4th 533 (2d Cir. 2024), and *Salazar v. Paramount Global*, 133 F.4th 642 (6th Cir. 2025), involved Video Privacy Protection Act claims in which a defendant disclosed personal viewing information tied to a Facebook ID.

Plaintiffs' inapposite and outdated authority cannot be squared with binding authority under *TransUnion*, *Barclift*, and *Cook*, and Plaintiffs offer no explanation for how their cases survive that precedent. Under the Third Circuit's governing standards, Plaintiffs have failed to allege concrete harm or actual injury. Their claims cannot satisfy Article III and must be dismissed.

**E. Plaintiffs' Assertion of Standing based on Claims of Unjust Enrichment and Breach of Fiduciary Duty Fail**

Plaintiffs' unjust enrichment and fiduciary duty theories fare no better. Both claims require Plaintiffs to allege a concrete, personal harm resulting from Cigna's conduct. Plaintiffs identify none. They do not allege that Cigna retained a benefit at their expense, that they lost money or property, or that any of the Online Technologies caused them to part with anything of value. Their unjust enrichment theory thus rests solely on the alleged statutory violation itself—precisely the sort of "injury in law" that *TransUnion* holds insufficient to establish standing in a suit for damages. *TransUnion*, 594 U.S. at 426-27.

Their fiduciary-duty theory is even further afield. Plaintiffs cite no authority—and allege no facts—indicating that an insurer owes a fiduciary duty merely by operating a website or

hosting an online member portal. Courts have rejected fiduciary-duty claims based on ordinary commercial relationships, and Plaintiffs allege nothing approaching the kind of entrustment, discretion, or imbalance of power that could give rise to such a duty. *See, e.g.*, *Zimmerman v. Highmark, Inc.*, 780 F. Supp. 3d 588, 604 (W.D. Pa. 2025) (rejecting argument that plaintiffs asserted "requisite confidential relationship" when the "complaint alleges an insurer-insured relationship"), *certificate of appealability denied*, 2025 WL 1724924 (W.D. Pa. June 20, 2025); *Marcum v. Columbia Gas Transmission, LLC*, 423 F. Supp. 3d 115, 122 (E.D. Pa. 2019) ("But Plaintiffs fail to identify a basis for a fiduciary duty existing between the parties—as pled, Plaintiffs and Columbia appear to be in a standard, arms-length business relationship."); *Yenchi v. Ameriprise Fin., Inc.*, 161 A.3d 811, 823 (Pa. 2017) ("[t]he case at bar presents an arm's-length consumer transaction in which the Yenchis accepted Holland's advice with respect to the purchase of the 1996 whole life insurance policy," and "[r]eliance on another's specialized skill or knowledge in making the purchase, without more, does not create a fiduciary relationship").

Plaintiffs identify no conduct here that could plausibly transform an ordinary service relationship into a fiduciary one. Even if such a duty existed or could be implied, Plaintiffs again fail to allege any resulting harm: no disclosure, no misuse of information, no reputational harm, and no adverse consequence of any kind. Without a concrete injury tethered to a recognized duty, these claims cannot proceed under Article III.

### F. Plaintiffs Also Lack Standing to Seek Injunctive Relief

Even if Plaintiffs could establish standing for damages—which they cannot—they independently lack standing to pursue injunctive relief. To obtain prospective relief, Plaintiffs must plausibly allege a real and immediate threat of repeated injury, not merely speculation about what might occur in the future. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 102-03 (1983); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401-02, 409-10 (2013) (the asserted injury

must be "certainly impending"). *TransUnion* likewise holds that "the mere risk of future harm, without more," cannot satisfy Article III. 594 U.S. at 437.

Plaintiffs allege no such imminent threat. They do not allege any ongoing interception of their communications without their knowledge or consent, any intention to visit the webpages at issue in the future, or any likelihood that their information will be misused. Their asserted harms—"worry," "embarrassment," and "increased vulnerability"—are precisely the sort of speculative fears that *Clapper* and *TransUnion* deem insufficient. And because the only alleged transmissions involve public webpages and purported disclosures under a HIPAA-compliant BAA, Plaintiffs cannot plausibly allege any risk of future unauthorized disclosure.

For the same reasons their damages theory fails, Plaintiffs cannot show the future harm required for injunctive relief. Their claims for equitable relief must be dismissed for lack of Article III standing as well.

## V. CONCLUSION

For the forgoing reasons and those set forth in Cigna's motion to dismiss the amended complaint, Cigna respectfully requests that the Court dismiss Plaintiffs' amended complaint in its entirety without leave to amend.

Dated: December 15, 2025

By: */s/ Tiffany Cheung*
Tiffany Cheung

TIFFANY CHEUNG (admitted *pro hac vice*)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105-2482
Telephone: (415) 268-7000
Email: TCheung@mofo.com

KATHERINE E. DRISCOLL (328688)
MORRISON & FOERSTER LLP
2100 L Street, NW Suite 900
Washington, DC 20037
Telephone: (202) 887-1500
Email: KDriscoll@mofo.com

ELISABETH HUTCHINSON (admitted *pro hac vice*)
MORRISON & FOERSTER LLP
4200 Republic Plaza, 370 Seventeenth Street
Denver, CO 80202-5638
Telephone: (303) 592-1500
Email: EHutchinson@mofo.com

JOE NGUYEN (93638)
BRIDGET C. GIROUD (321289)
STRADLEY RONON STEVENS & YOUNG, LLP
2005 Market Street
Suite 2600
Philadelphia, PA 19103
Telephone: (215) 564-8000
Email: JNguyen@stradley.com
Email: BGiroud@stradley.com

***Counsel for Defendants Cigna Corporate Services, LLC and The Cigna Group***

**CERTIFICATE OF SERVICE**

I, Tiffany Cheung, hereby certify that on December 15, 2025, the foregoing document was filed electronically with the Clerk of the Court using the ECF system. This document is available for reviewing and downloading from the ECF system.

/s/ *Tiffany Cheung*
Tiffany Cheung