**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JERRY M. ADAIR, et al.,** | **CIVIL ACTION** |
| **Plaintiffs,** | |
| **v.** | |
| **CIGNA CORPORATE SERVICES, LLC,** and **THE CIGNA GROUP,** | **NO.  25-2384** |
| **Defendants.** | |

**MEMORANDUM OPINION**

In recent years, the proliferation of Internet tracking technologies has flooded federal courts with invasion of privacy cases.  This is one of them.  Four individuals allege that their insurance carrier, The Cigna Group ("Cigna"), and its subsidiary, Cigna Corporate Services, LLC ("CCS"), embedded third-party tracking technologies throughout Cigna's public website and secure member portal.  Consequently, during everyday efforts to manage their healthcare through the website, Plaintiffs allege that their protected health information was captured and collected so that it could be used for marketing purposes.  They now bring, on behalf of a putative class, claims under federal and Pennsylvania law premised on Defendants' exchange of insureds' privacy for commercial gain.  Defendants have moved to dismiss the Second Amended Complaint ("SAC") pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  Fed. R. Civ. P. 12(b)(6).  For the reasons explained below, the motion will be granted in part and denied in part.

1

## I.    FACTUAL BACKGROUND[1]

Defendant Cigna is a Delaware corporation based in Connecticut.  It is one of the nation's largest providers of health insurance and health services.  Defendant CCS is Cigna's wholly owned subsidiary incorporated in Delaware and headquartered in Philadelphia, Pennsylvania. CCS operates Cigna's digital infrastructure, including the Cigna-branded public website, www.cigna.com, and the "myCigna" member portal.  Both entities are subject to the Health Insurance Portability and Accountability Act ("HIPAA"), 42 U.S.C. § 1320d *et seq*., and its implementing regulations,[2] which, among other things, prohibit any unauthorized "use or disclosure of protected health information for marketing."  45 C.F.R. § 164.508(a)(3).

Named Plaintiffs are four individuals presently or formerly insured under Cigna health, dental, or vision plans.  They accessed Defendants' website to manage their healthcare coverage, review benefit information, and obtain materials associated with medical care, including information related to prescriptions, providers, procedures, and medical conditions.  When doing so, third-party tracking technologies intercepted their website interactions without notice, consent, or an opportunity to opt out.

The technologies work like this: when a user visits a website, his browser sends an HTTP request to the website's server.  The server then returns an HTTP response, providing the "markup" and "source code" dictating how the webpage appears and behaves on the user's browser.  Source code can be written to include instructions to send data via background HTTP

---

[1] The well-pleaded allegations in the SAC are taken as true at this stage.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).

[2] Cigna, as a provider of health plans, is a "covered entity" under HIPAA.  45 C.F.R. §§ 160.102-.103.  CCS, as an entity that "creates, receives, maintains, or transmits protected health information for a function or activity" on behalf of Cigna, is a "business associate" under HIPAA, *id.* § 160.103, and thus also subject to the Act, i*d.* § 160.102.

requests known as "GET requests." Those "requests" actually transmit information in real time about a user's website interactions.

Plaintiffs allege that the Cigna website's source code includes tracking pixels and session replay code[3] that trigger GET requests to third-party servers. On Defendants' public-facing webpages, users' mouse movements, clicks, keystrokes (including text entered into search boxes), page-specific URLs, and other electronic communications are transmitted to eight third-party vendors.[4] Meanwhile, within Defendants' authenticated[5] myCigna medical and dental portals, users' interactions are transmitted to "smetrics.cigna.com"—a domain that belongs to Adobe. Through cookies and persistent identifiers, the tracking technologies aggregate user data across web sessions, websites, and devices.

Use of digital tracking technologies in the healthcare industry has not gone unnoticed by regulators. The Department of Health and Human Services issued a bulletin stating that HIPAA-regulated entities "are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of [protected health information] to tracking technology vendors or any other violations of the HIPAA rules." *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. Dep't of Health & Hum. Servs. (June 26, 2024), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html. The bulletin continues: "For example, disclosures of [protected health information] to tracking

---

[3] A tracking pixel is "a piece of code that tracks users' interactions with a website, including their pages visited, any buttons clicked, and the full text of any search queries entered." Session replay code "logs and tracks everything a user does on a webpage, including mouse movements, clicks, scrolls, and taps, and can actually track every single key stroke, creating a complete reproduction of the user's visit to the website."

[4] The vendors are Google, Meta, Pinterest, Snapchat, The Trade Desk, LiveRamp, Demandbase, and MediaMath.

[5] As explained in the SAC, "authenticated" websites "require a user to log in" whereas "unauthenticated" pages do not.

3

technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures." *Id.* In addition to violating HIPAA, "[s]uch disclosures can reveal incredibly sensitive information about an individual" and "may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to . . . reputation, health, or physical safety." *Id.*

Plaintiffs allege that Defendants' deployment of the third-party technologies has resulted in the disclosure of their protected health information. That data, according to Plaintiffs, is incredibly valuable. It has an inherent (and commodifiable) capacity to reveal an individual's likelihood of purchasing a product or service,[6] so it has been harvested into "marketing fodder." The third-party vendors use it to create or bolster advertising profiles, target advertising, and sell insureds' information to other entities. Similarly, Defendants use it to track visits, enabling them to add new customers and save on advertising costs.

Defendants' user policies disclose the deployment of the tracking technologies across the Cigna website. The Terms of Use and the incorporated Privacy Notice apply to all portions of the website and generally govern how information "describ[ing] or relat[ing] to" users may be collected and used. The Privacy Notice notifies users that Cigna and "third-party ad companies may use cookies, pixel tags, and other tools to collect browsing and activity information within our Services (as well as on third-party websites and services), as well as IP addresses, unique ID, cookie and advertising IDs, and other online identifiers." The data is collected to provide services, tailor content, and improve advertising, among other reasons.

However, the Privacy Policy provides that when the collected information is protected

---

[6] To use an oversimplified example, knowing that someone is diabetic is informative to an algorithm deciding whether to show an ad for sugary food or a GLP-1 medication.

by HIPAA, "the terms of the applicable HIPAA Notice of Privacy Practices will apply and will supersede." The HIPAA Notice in turn describes how Defendants obtain, maintain, use, and disclose insureds' protected health information in compliance with HIPAA. As relevant here, the HIPAA Notice explicitly represents that uses and disclosures of protected health information "for marketing purposes . . . will be made only with [insureds'] authorization." Plaintiffs provided no such authorization.

Plaintiffs allege that Defendants' practices have caused them numerous injuries, including "loss of privacy, embarrassment, and greatly increased vulnerability to identity theft and fraud, as well as having their confidential information used for the benefit of Defendants and others." On behalf of themselves and a putative class,[7] they now bring claims under the Federal Wiretap Act ("FWA"), 18 U.S.C. § 2510 *et seq.*, as amended, and the Pennsylvania Wiretapping and Electronic Surveillance Control Act ("WESCA"), 18 Pa. C.S.A. § 5701 *et seq.*, as well as Pennsylvania common law claims for intrusion upon seclusion, breach of fiduciary duty, and unjust enrichment.

## II.    LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Threadbare

---

[7] Plaintiffs propose a class consisting of "[e]very current and former insured of Cigna whose Website Communications were captured from May 9, 2023 through the use of Tracking Pixels and/or Session Replay Code embedded in Defendants' Website, www.cigna.com, subpages, including medical and dental portals to the date of judgment herein."

5

recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* The complaint must be construed "in the light most favorable to the plaintiff," with the question being "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler*, 578 F.3d at 210 (citation omitted). Legal conclusions are disregarded, well-pleaded facts are taken as true, and a determination is made as to whether those facts state a "plausible claim for relief." *Id.* at 210-11. Documents that are "integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (brackets, quotation marks, and citation omitted).[8]

### III.    DISCUSSION

#### A.  The SAC Complies with Rule 8

As a threshold matter, and to frame the issues that follow, Defendants challenge Plaintiffs' strategy of pleading two theories of the case. The first theory, reflected in numerous allegations in the SAC, posits that Defendants themselves unlawfully wiretapped Plaintiffs' communications. Plaintiffs, for example, describe this lawsuit as a challenge to "Defendants' unlawful interception and misuse of" insureds' information, and they assert several claims on the premise that Defendants are the primary interceptors. By contrast, their second theory is that by integrating the tracking technologies into the Cigna website's source code, Defendants "facilitated" and "enabled" interceptions by the nine third-party vendors.

Defendants assert that Plaintiffs' alternative theories render them unable to properly defend themselves in this litigation. In their view, Plaintiffs "inconsistently allege" who is the

---

[8] Defendants' Terms of Use, Privacy Notice, and HIPAA Notice are "explicitly refer[red] to," "cite[d]," and quoted in the SAC. *Burlington Coat*, 114 F.3d at 1426. Each document—attached to Defendants' motion—is therefore fairly considered here.

relevant interceptor and transgress Rule 8's requirement that a pleading contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Twombly*, 550 U.S. at 555 (ellipsis omitted) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  On this ground alone, Defendants suggest that the SAC should be dismissed.

Their contention is unpersuasive.  For one thing, it is difficult to understand why Defendants perceive the identity of the interceptor to be an either-or situation.  Indeed, Plaintiffs bring claims under both the FWA and the WESCA.  Those laws contain identical definitions for the term "intercept": the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device.  18 U.S.C. § 2510(4); 18 Pa. C.S.A. § 5702.  That definition, the Third Circuit has observed, "gives the word a 'broader connotation than the ordinary meaning.'" *Popa v. Harriet Carter Gifts*, *Inc.*, 52 F.4th 121, 126 (3d Cir. 2022) (quoting *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 144 n.80 (3d Cir. 2015)).  It encompasses everything from listening in on a telephone conversation through a cut wire to the receipt of a "text message or chat." *Id.*  Just as multiple people in a group chat may "intercept" a text, so too might there be other situations where a wiretapping device enables interceptions by multiple entities.  Here, Plaintiffs allege that the embedded tracking technologies forwarded their electronic communications as they interfaced with Defendants' website.  Those allegations describe independent "interceptions" within the meaning of the wiretapping statutes.  Substantively then, Plaintiffs accurately describe Defendants *and* the third parties as the alleged interceptors.

But even assuming the SAC inconsistently identified the alleged wiretapper dismissal would still be unwarranted.  That is because, subject to the limitations in Rule 11, Rule 8 permits

7

a pleading's presentation of alternative facts and legal theories.  It provides: "A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones.  If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient."  Fed. R. Civ. P. 8(d)(2); *see also Henry v. Daytop Vill., Inc.*, 42 F.3d 89, 95 (2d Cir. 1994) (explaining that "[t]he inconsistency may lie either in the statement of the facts or in the legal theories adopted" (quotation marks and citation omitted)).  Enactment of Rule 8(d)(2) represented a significant change to the federal pleading rules.  As a leading treatise explains:

> Alternative and hypothetical pleading generally was not permitted under common law or code practice.  Courts required pleading allegations to be stated with certainty in the hope of apprising the adversary of the precise issues involved in the litigation.  As a result, a party was required to elect a particular set of facts and a legal theory at the pleading stage.  Unfortunately, this forced a litigant to set forth his allegations with a degree of certainty that often was not warranted in terms of the state of the pleader's knowledge at that point in the case.  If the facts he asserted in the pleadings were not confirmed by later proof, the action or defense would fail even if the proof demonstrated a right to relief or defense on some other theory.

> Those who drafted Rule 8(d)(2) sought to free federal procedure from this insistence on certainty in the pleadings.  They realized that in a complex legal environment flexible pleading was essential to a full presentation of all relevant facts and legal theories at trial and the final settlement of disputes on their merits.

5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1282 (4th ed. 2026).  Here, freed from the old strictures on pleading, Plaintiffs make alternative characterizations about the interceptor's identity to pursue different theories of liability.  Because Defendants' challenge to that strategy seeks a degree of certainty that is simply not required by the Federal Rules in this day and age, the SAC will not be dismissed for failure to comply with Rule 8.  Plaintiffs' theories will be entertained as appropriate in determining whether the SAC contains "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.

### B. The Law of the Case Doctrine Controls the Breach of Fiduciary Duty Claims

An additional threshold issue requires discussion.  The Court previously held that Plaintiffs' breach of fiduciary duty claims could proceed.  *Adair v. Cigna Corp. Servs., LLC*, 818 F. Supp.3d 641, 672-73 (E.D. Pa. 2026).  Citing nonprecedential cases, Defendants had argued they did not owe a fiduciary duty to their insured members.  The argument was unavailing.  Plaintiffs plausibly alleged the existence of a confidential relationship because they entrusted Defendants with protecting the private and personal health information entered on the Cigna website.  *Id.* at 672-73; *see also Yenchi v. Ameriprise Fin., Inc.*, 161 A.3d 811, 819-20 (Pa. 2017) (explaining that a fiduciary relationship can arise "'when the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed'" (quoting *Frowen v. Blank*, 425 A.2d 412, 416-17 (Pa. 1981))).

While interlocutory orders may be revised before final judgment, Fed. R. Civ. P. 54(b), that discretion is guided by the law of the case doctrine, which "directs courts to refrain from re-deciding issues that were resolved earlier in the litigation," *Pub. Int. Rsch. Grp. of N.J., Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116 (3d Cir. 1997).  As the Supreme Court has explained: "A court has the power to revisit prior decisions of its own . . . , although as a rule courts should be loathe to do so in the absence of extraordinary circumstances . . . ." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988).  Extraordinary circumstances warranting reconsideration include: (1) the availability of "new evidence"; (2) a supervening change in the law; and, (3) the need to correct a clear error or prevent "manifest injustice." *Pub. Int.*, 123 F.3d at 116-17 (citations omitted).  Even when an amended complaint has been filed, revisiting decided issues absent such extraordinary circumstances contravenes

principles of finality and judicial economy. *Id.* at 116. Accordingly, courts routinely apply the law of the case doctrine to their conclusions in a prior motion to dismiss. *See, e.g.*, *Gundell v. Sleepy's Inc.*, 2019 WL 6040004, at *2 (D.N.J. Nov. 14, 2019); *Prime Energy & Chem., LLC v. Tucker Arensberg, P.C.*, 2019 WL 3778756, at *7 (W.D. Pa. Aug. 12, 2019); *Prod. Source Int'l, LLC v. Foremost Signature Ins. Co.*, 234 F. Supp.3d 619, 624-25 (D.N.J. 2017); *Dorley v. S. Fayette Twp. Sch. Dist.*, 2016 WL 3102227, at *8-9 (W.D. Pa. June 1, 2016); *Volynsky v. Clinton*, 2012 WL 2362398, at *4 (E.D. Pa. June 21, 2012).

Here, extraordinary circumstances are patently absent: the SAC contains the same material allegations as before, Defendants identify no change in controlling law, and adherence to the prior ruling would not result in manifest injustice. Instead, Defendants are "disappointed litigant[s]" seeking review of a "matter that has been fully considered." *Hayman Cash Register Co. v. Sarokin*, 669 F.2d 162, 169 (3d Cir. 1982). Because the Court's prior holding remains the law of the case, Plaintiffs may continue to develop their breach of fiduciary claims through discovery.

### C. Plaintiffs Plausibly Allege Unauthorized Interceptions

Most of Plaintiffs' claims were previously dismissed on the ground that they had consented to Defendants' use of the third-party tracking technologies. *See Adair*, 818 F. Supp.3d at 668-71. Defendants renew that argument in seeking dismissal of the SAC.

Plaintiffs' consent—to the extent it was given—matters across the board to their claims, though in different ways. For their statutory causes of action, their consent would trigger exceptions to liability. The FWA permits interceptions "where one of the parties to the communication has given prior consent." 18 U.S.C. § 2511(2)(d); *see also In re Google*, 806 F.3d at 136 (referring to § 2511(2)(d) as one "[o]f several statutory exceptions"). The WESCA contains a similar but more demanding carveout. Its "all-party consent exception" makes it

lawful "for someone to 'intercept a wire, electronic or oral communication, where all parties to the communication have given prior consent to such interception.'" *Popa*, 52 F.4th at 132 (quoting 18 Pa. C.S.A. § 5704(4)).  Defendants maintain that both exceptions apply because all parties, including themselves, consented to the challenged conduct.

Plaintiffs' consent (or lack thereof) is also material to their common law claim for unjust enrichment.  It informs "[t]he most significant element of the doctrine": that a defendant's retention of a benefit be "inequitable."  *AmeriPro Search, Inc. v. Fleming Steel Co.*, 787 A.2d 988, 991 (Pa. Super. 2001) (internal quotation marks and citation omitted).  If Defendants tracked, collected, and used information pursuant to a valid agreement with website users, then any resulting enrichment could hardly be termed unjust.  *Cf. Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245 (1978) ("Contracts enable individuals to order their personal and business affairs according to their particular needs and interests.  Once arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them.").

At the motion to dismiss stage, consent must be "'apparent on the face of the complaint' and documents relied on in the complaint" for dismissal to be appropriate.  *Lupian v. Joseph Cory Holdings LLC*, 905 F.3d 127, 130 (3d Cir. 2018) (quoting *Bohus v. Restaurant.com, Inc.*, 784 F.3d 918, 923 n.2 (3d Cir. 2015)).  Accordingly, the parties start from a common premise— the SAC's allegations—but disagree on how those allegations map onto the disclosures in Defendants' user notices defining insureds' and Defendants' rights and obligations with respect to the web properties.  Three documents are at play: the Terms of Use, the Privacy Notice, and the HIPAA Notice.  The parties go back and forth on whether insureds assented to any of these notices and whether the disclosures within them adequately alerted users to the use of third-party tracking technologies.  To survive dismissal, however, Plaintiffs need only show that at least

11

some aspects of the alleged interceptions were unauthorized.  *See Iqbal*, 556 U.S. at 663

(explaining that a claim survives a motion to dismiss "when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged").  They have done so with respect to the alleged interceptions within the

secure user portals.[9]

Plaintiffs plausibly allege that Defendants disclosed their HIPAA-protected health

information to a third party, Adobe, without valid authorization.  Defendants embedded Adobe's

tracking pixel within the medical and dental portals.  When users log in to those purportedly

secure environments, the pixel immediately begins transmitting data about users' interactions—

such as their IP address, referring URLs, searches throughout the website, and form

submissions—to "smetrics.cigna.com."  That domain name masks the fact that the data is

actually sent to Adobe's cloud infrastructure and servers.

The data plausibly qualifies as protected health information ("PHI") under HIPAA.[10]  It

is individually identifiable to insureds "through their names" and cookies placed onto their

devices.  And it is sufficiently detailed to reveal information about diagnoses, conditions, and

treatments.  If, for example, a user accesses the portal to find a provider for a vasectomy, Adobe

---

[9] Indeed, the focus of the analysis must be on the secure portals.  Although the SAC dedicates pages to describing the technologies operating on the public-facing webpages, Plaintiffs fail to describe in any detail their interactions with those pages.

[10] HIPAA generally defines "protected health information" as "individually identifiable health information."  45 C.F.R. § 160.103.  Individually identifiable health information is any health or demographic information that:
>    (1) Is created or received by a health care provider, health plan, employer, or health care clearinghouse; and
>    (2) Relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and
>        (i) That identifies the individual; or
>        (ii) With respect to which there is a reasonable basis to believe the information can be used to identify the individual.

*Id.*

tracks the search term, "vasectomy CPT 55250," and can extrapolate that the insured is seeking information related to that procedure. Such an interception is not merely hypothetical. All Plaintiffs allege using the portals to search for providers, review medical issues, and review their insurance claims. For instance, when they used the portals' "reason for visit" search tab, whatever ailment or condition entered was captured and forwarded to Adobe.

Furthermore, Plaintiffs allege that the collection of their data served a marketing purpose. According to the SAC, a user's website activity supplies Adobe with valuable information about his or her health conditions. Adobe then aggregates that data and uses it to optimize advertising campaigns, predict user value, and inform bidding decisions for advertisements shown across the web. In other words, insureds' highly sensitive and legally protected medical information becomes an input for the largely out-of-sight, "data-collecting infrastructure of the digital world [that] hums along quietly in the background" to deliver personalized ads. *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 267 (3d Cir. 2016).

Of Defendants' three notices and the many disclosures within them, the foregoing allegations implicate just one provision. Specifically, the HIPAA Notice assures that "uses and disclosures" of PHI "for marketing purposes" will not occur without "an authorization," a representation that reflects what HIPAA already demands. *See* 45 C.F.R. § 164.508(a)(3) (providing that "a covered entity must obtain an authorization for any use or disclosure of protected health information for marketing"); *id.* § 164.508(c) (defining a "valid authorization" as containing, among other things, a "specific and meaningful" "description of the information to be used or disclosed," "a description of each purpose of the requested use or disclosure," and the "[s]ignature of the individual"). The SAC alleges, however, that Plaintiffs did not provide the requisite authorization. That allegation—which must be taken as true—defeats Defendants'

consent argument.

Defendants' arguments to the contrary are not persuasive. First, invoking the doctrines of judicial estoppel and equitable estoppel—and pointing to language in the Terms of Use—they argue that Plaintiffs assented to the Terms of Use and the incorporated Privacy Notice. Even assuming that is true, it makes no difference. The Privacy Notice affirmatively represents that when PHI is collected, the HIPAA Notice "supersede[s]" and its terms "will apply" instead. Thus, the HIPAA Notice is the operative agreement, and, as explained above, Plaintiffs plausibly allege it was violated. For similar reasons, whether Plaintiffs assented to any notice under an inquiry notice theory is immaterial. Where, as here, PHI is disclosed for marketing purposes, the HIPAA Notice (and HIPAA itself) require Defendants to obtain a written, signed authorization. They failed to do so.

Second, although in a separate section of their briefing, Defendants argue that Plaintiffs fail to allege that their data constituted PHI. Defendants note that Plaintiffs Emrick and Pham purport to have used the portal to "find a provider," "search for prescriptions," and "research health conditions." Meanwhile, Plaintiffs Adair and Recchia allege that they disclosed "sensitive medical information" and a "medical condition." Defendants' contention that these particular allegations are insufficiently specific is not well taken. Defendants overlook allegations plausibly demonstrating that the captured information "[r]elate[d] to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual." 45 C.F.R. § 160.103. For example, Plaintiffs allege logging in to the secure portals. That alone disclosed PHI by revealing that they have received or are receiving healthcare. *See Nienaber v. Overlake Hosp. Med. Ctr.*, 733 F. Supp.3d 1072, 1081-82 (W.D. Wash. 2024)

14

(collecting cases recognizing that "the transmission of information submitted to a private patient portal—such as a user clicking on the 'log in' button on that webpage—reveals patient status, which in and of itself is protected health information").  Furthermore, each Plaintiff alleges (although with varying degrees of specificity) portal activity that plausibly disclosed their health conditions and treatments.  Plaintiff Adair pleads that he engaged with the medical portal's search and navigation functions after receiving preventive healthcare, such as blood sugar screenings.  Plaintiff Emrick alleges she searched for intestinal screening providers, which required her to navigate to pages pertaining to that procedure.  Plaintiff Recchia alleges she searched for a new primary care physician and accessed pages relating to a surgical dental procedure she had undergone.  And Plaintiff Pham accessed it "to search for prescriptions and to research health conditions," which, read in the context of the entire SAC, supports an inference that she did so to manage her own medical needs.  These examples plausibly allege that Defendants intercepted Plaintiffs' PHI.

Finally, Defendants maintain that Plaintiffs conclusorily allege that their PHI was shared specifically for marketing purposes.  Hardly so.  The entire theory of Plaintiffs' case is that insureds' health data has immense commercial value insofar as it reveals traits—namely, their medical history—indicating that they are most likely to be interested in a particular product or service.  Seeing the value of that data, Defendants and third-party firms allegedly track insureds' website interactions to harvest their health-related information.  The data is then used, among other ways, to "segment" insureds into target audiences tied to their medical conditions and inform the automated auctions that determine which advertisement appears for a particular user.

Adobe provides tools and services that operationalize those processes.  As the SAC alleges, Defendants use Adobe's tracking pixel and "Adobe Advertising" services so that users'

portal interactions can be used "to optimize advertising campaigns, predict user value, and inform bidding decisions for advertisements shown across the internet."  It is true that Plaintiffs do not allege receiving advertisements tied to their portal activity.  But contrary to Defendants' suggestion, that omission does not render implausible the SAC's other well-pleaded allegations that Plaintiffs' PHI was disclosed for marketing purposes.  And to the extent Defendants contend that they disclosed PHI to Adobe for lawful uses—such as "for treatment, payment, or health care operations," 45 C.F.R. § 164.506—such a contention injects a "[f]actual claim" that improperly contradicts the "'allegations in the complaint,'" *Doe v. Princeton Univ.*, 30 F.4th 335, 344-45 (3d Cir. 2022) (quoting *Twombly*, 550 U.S. at 555).

In sum, the SAC plausibly pleads that Defendants violated their HIPAA Notice and HIPAA itself by failing to obtain authorization before disclosing Plaintiffs' PHI for marketing purposes.  Accordingly, Plaintiffs' FWA, WESCA, and unjust enrichment claims will not be dismissed on the basis of lack of consent.

### D.  Plaintiffs Plausibly Allege Federal Wiretap Act Claims

Defendants argue Plaintiffs' FWA claims should be dismissed due to the statute's one-party consent exception.  The FWA, as amended by the Electronic Communications Privacy Act of 1986, Pub. L. No. 99-508, 100 Stat. 1848, protects the privacy of electronic communications by prohibiting their unauthorized "intercept[ion]" and related conduct.  18 U.S.C. § 2511(1)(a).  It "define[s] five offenses," *Bartnicki v. Vopper*, 532 U.S. 514, 523 (2001), three of which Plaintiffs press here.  First, it proscribes "intentionally intercept[ing]" or "procur[ing] any other person to intercept" an electronic communication.  18 U.S.C. § 2511(1)(a).  Second, it prohibits "intentionally disclos[ing] . . . to any other person the contents" of an electronic communication "knowing or having reason to know that the information was obtained through" an unlawful interception.  18 U.S.C. § 2511(1)(c).  And third, it forbids "intentionally us[ing] . . . the

16

contents" of an electronic communication "knowing or having reason to know that the information" was illicitly obtained.  18 U.S.C. § 2511(1)(d).  Each provision is an independent basis for liability.[11]

They are all, however, subject to a statutory exception.  As stated above, the FWA provides that "[i]t shall not be unlawful under this chapter for a person . . . to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception."  18 U.S.C. § 2511(2)(d).  The exception applies here, regardless of whom Plaintiffs label as the relevant interceptor.  There is no dispute that Defendants were "the intended recipients" of Plaintiffs' transmissions, and "the intended recipient of a communication is necessarily one of its parties." *In re Google*, 806 F.3d at 143.  Therefore, on the theory that Defendants are the primary interceptors, Section 2511(2)(d) plainly applies because Defendants were a "party to the communication."  18 U.S.C. § 2511(2)(d).  Furthermore, section 2511(2)(d)—which also applies "where one of the parties to the communication has given prior consent to such interception," *id.*—immunizes Defendants for allegedly procuring third-party interceptions.  Defendants (*i.e.*, parties to the communications) deliberately enabled third-party interceptions in the first instance

---

[11] Defendants argue that the FWA does not create civil liability for procuring an interception.  That conduct, they note, is codified in the FWA as a criminal offense.  *See* 18 U.S.C. §§ 2511(1), (4)(a) (providing that violations are punishable by fine, imprisonment up to five years, or both).  But the FWA's civil cause of action is circumscribed. It grants a right to sue to "any person whose . . . electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter" against the entity "which engaged in that violation."  18 U.S.C. § 2520(a). Procuring an interception is notably not among the listed violations.

Defendants' argument certainly has force.  And it is supported by decisions from sister circuits.  *See, e.g.*, *Kirch v. Embarq Mgmt. Co.*, 702 F.3d 1245, 1246-47 (10th Cir. 2012); *Peavy v. WFAA-TV, Inc.*, 221 F.3d 158, 168-69 (5th Cir. 2000).  But the Third Circuit has come out the other way.  It has twice held that the FWA imposes liability where a defendant "(1) intentionally (2) intercepted, endeavored to intercept *or procured another person to intercept or endeavor to intercept* (3) the contents of (4) an electronic communication, (5) using a device."  *In re Nickelodeon*, 827 F.3d at 274 (emphasis added) (quoting *In re Google*, 806 F.3d at 135); *see also, e.g.*, *In re Pharmatrak, Inc.*, 329 F.3d 9, 18 (1st Cir. 2003) (articulating the same elements).  Accordingly, Plaintiffs may pursue their procurement theory.

and therefore necessarily consented to such interceptions.  Thus, although Plaintiffs' purported consent does not bar their FWA claims, Defendants' party status and consent independently trigger Section 2511(2)(d) and render them not liable—that is, unless Plaintiffs have pleaded an exception to the exception.

There is a "crime-tort exception" that applies if Defendants intercepted Plaintiffs' communications "for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." *Id.*  To invoke that carveout and "'survive a motion to dismiss, a plaintiff must plead sufficient facts to support an inference that the offender intercepted the communication for the purpose of a tortious or criminal act that is independent of the intentional act of recording.'"  *In re Google*, 806 F.3d at 145 (quoting *Caro v. Weintraub*, 618 F.3d 94, 100 (2d Cir. 2010)).  Where there are two motivations for an interception—one lawful and the other not—the exception still applies.  *See Sussman v. Am. Broad. Cos., Inc.*, 186 F.3d 1200, 1202 (9th Cir. 1999) ("[T]he existence of a lawful purpose does not mean that the interception is not also for a tortious or unlawful purpose.").

Here, Plaintiffs primarily argue that the crime-tort exception saves their FWA claims because Defendants violated HIPAA.[12]  Pursuant to 42 U.S.C. § 1320d-6, it is a federal crime to knowingly "disclose[] individually identifiable health information to another person . . . without authorization."  42 U.S.C. § 1320d-6(a).  Courts have widely recognized that an intention to violate Section 1320d-6(a) is an "independent or secondary act" that can trigger the crime-tort exception.  *Smart v. Main Line Health*, 2026 WL 1008171, at *3-4 (E.D. Pa. Apr. 14, 2026); *see*

---

[12] They also maintain that the interceptions were carried out to further other "tortious acts," namely, violations of the WESCA and of intrusion upon seclusion.  Neither offense can serve as the predicate for the crime-tort exception. For it to apply, the crime or tort must be "'*independent* of the intentional act of recording.'"  *In re Google*, 806 F.3d at 145 (quoting *Caro*, 618 F.3d at 100).  The asserted wiretapping (WESCA) and privacy (intrusion upon seclusion) violations are not independent.  Rather, they "'occur[] through the act of interception itself.'"  *Id.* (quoting *Caro*, 618 F.3d at 100-01).

18

*also, e.g.*, *Murphy v. Thomas Jefferson Univ. Hosps., Inc.*, 2024 WL 4350328, at *4-5 (E.D. Pa. Sep. 30, 2024); *Cooper v. Mount Sinai Health Sys., Inc.*, 742 F. Supp.3d 369, 380 (S.D.N.Y. 2024) (collecting cases). And at the pleading stage, before the benefit of discovery, courts do not demand too much by way of what facts plausibly demonstrate a defendant's culpable intention. To the contrary, intent is plausibly inferred from allegations that a defendant knowingly enabled unauthorized third-party interceptions of PHI for commercial gain. *See, e.g.*, *Murphy*, 2024 WL 4350328, at *4 ("Plaintiffs allege that Defendant intercepted Plaintiffs' [PHI] for the intended use of disclosing the information to Meta, which is a HIPAA violation and therefore prohibited by federal law."); *Cooper*, 742 F. Supp.3d at 380-82 (applying the crime-tort exception where plaintiffs alleged a New York-area health system "knowingly and deliberately," "to improve its marketing," added tracking pixels to its website that disclosed patient PHI to third parties); *Kurowski v. Rush Sys. for Health*, 2023 WL 8544084, at *3 (N.D. Ill. Dec. 11, 2023) (finding sufficient allegations that "Rush knowingly transmits" PHI to third parties "for the purpose of financial gain," namely, to deliver targeted advertising); *In re Grp. Health Plan Litig.*, 709 F. Supp.3d 707, 719-20 (D. Minn. 2023) (denying dismissal of FWA claims where plaintiffs alleged that the "primary motivation" of HIPAA-violative interceptions was "for marketing and revenue generation").

As previously explained, Plaintiffs plausibly allege that their PHI was disclosed to third parties without the proper authorization. Moreover, Defendants knowingly and deliberately deployed the technologies to improve marketing practices and reap a financial benefit. These allegations plausibly allege that Defendants intercepted Plaintiffs' communications for the purpose of violating Section 1320d-6. Thus, the crime-tort exception plausibly applies.

Defendants resist this conclusion. Relying on out-of-circuit cases, they suggest that if

19

their purpose in sharing insureds' PHI was "purely commercial," then they could not have simultaneously intended to violate HIPAA.  *See, e.g.*, *Doe v. Kaiser Found. Health Plan, Inc.*, 2024 WL 1589982, at \*10 (N.D. Cal. Apr. 11, 2024); *Rodriguez v. Google LLC*, 2021 WL 2026726, at \*6 n.8 (N.D. Cal. May 21, 2021).  This Court agrees with others that the "broad theory that the presence of a primary financial motive inoculates a defendant from liability under the ECPA is wrong."  *Cooper*, 742 F. Supp.3d at 382; *see also In re Grp. Health*, 709 F. Supp.3d at 720.  In fact, it is quite a bizarre proposition.  It implies that the bare motive to make money, even when the means for doing so are illegal, means the crime-tort exception never applies.  That logic risks rendering the exception nugatory and is completely at odds with Section 1320d-6 itself, which provides enhanced criminal penalties where PHI is disclosed "for commercial advantage" or "personal gain."  42 U.S.C. § 1320d-6(b)(3).

Because the crime-tort exception plausibly applies, Plaintiffs' FWA claims may proceed.

### E.  Plaintiffs' WESCA Claims May Proceed

The Wiretapping and Electronic Surveillance Control Act ("WESCA") is Pennsylvania's counterpart to the FWA.  It provides "a private civil cause of action to 'any person whose wire, electronic or oral communication is intercepted, disclosed or used in violation of [the WESCA]' against 'any person who intercepts, discloses or uses or procures any other person to intercept, disclose or use, such communication.'"  *Popa*, 52 F.4th at 126 (brackets omitted) (quoting 18 Pa. C.S.A. § 5725(a)).  Defendants challenge whether that cause of action extends to out-of-state individuals like the Named Plaintiffs, who reside in California, Massachusetts, New York, and Ohio.  In essence, Defendants argue that Plaintiffs sued under the wrong state law.

To argue that the WESCA applies to them, Plaintiffs first point to the choice of law provision in Defendants' Terms of Use, contending that Defendants themselves opted for Pennsylvania law to apply to website-related suits.  Their argument turns on the specific

20

language within the choice of law provision, which states: "These Terms of Use and the Site Specific Terms shall be governed by and construed in accordance with the laws of the state of Pennsylvania, U.S.A., excluding its conflict of law rules."

"'Pennsylvania courts analyze choice of law provisions to determine, based on their narrowness or breadth, whether the parties intended to encompass all elements of their association.'" *Happy v. Marlette Funding, LLC*, 744 F. Supp.3d 403, 410 (W.D. Pa. 2024) (quoting *Grimm v. Discover Fin. Servs.*, 2008 WL 4821695, at *8 (W.D. Pa. Nov. 4, 2008)); *see also Jiffy Lube Int'l, Inc. v. Jiffy Lube of Pa., Inc.*, 848 F. Supp. 569, 576 (E.D. Pa. 1994) ("Contractual choice of law provisions . . . do not govern tort claims between contracting parties unless the fair import of the provision embraces all aspects of the legal relationship."). "'Narrow choice of law provisions stating that a contract's terms or enforcement are to be governed, or construed, by the laws of [a particular] state are generally interpreted by Pennsylvania courts to relate only to the construction and interpretation of the contract at issue.'" *Happy*, 744 F. Supp.3d at 410 (quoting *Grimm*, 2008 WL 4821695, at *8). By contrast, provisions can be broadly drafted to require application of a particular state's law for any claim arising from the parties' relationship. *See id.* As written, Defendants' choice of law provision is narrow, encompassing only the "parties' rights and duties under the contract itself." *Id.* Indeed, "[t]he operative terms 'governed by' and 'construed in accordance with' are limited to the interpretation and enforcement of the agreement." *De Lage Landen Fin. Servs., Inc. v. Cardservice Int'l, Inc.*, 2001 WL 799870, at *2 (E.D. Pa. July 12, 2001).

The narrowness of this provision is readily apparent when juxtaposed against another in the Terms of Use: the forum selection clause. The forum selection clause broadly provides that "[a]ny dispute, claim, action, or proceeding arising out of or relating to the Site, the Site Content,

21

the Privacy Notice, the Site Specific Terms, or these Terms of Use, or the interpretation or enforcement hereof, whether at law or in equity" must be brought in a court encompassing Philadelphia. Similarly expansive language—about applying Pennsylvania law to "any" claims relating to use of the Cigna website—could have been (but was not) used in the choice of law provision. Thus, because the choice of law provision pertains only to construction of the Terms of Use, it does not indicate the parties' intent to litigate exclusively under Pennsylvania laws.

The parties' disagreement concerning the WESCA's applicability does not end there. It continues with arguments grounded in the Third Circuit's instructive decision in *Popa v. Harriet Carter Gifts* about the statute's territorial scope. That case involved facts very similar to those here. Popa alleged that her interactions with Harriet Carter Gifts' website had been surreptitiously tracked and sent to a third-party marketing service, NaviStone. *Popa*, 52 F.4th at 124. Accordingly, she brought WESCA claims against both Harriet Carter and NaviStone. *Id.* At summary judgment, the district court determined from the record evidence that when Popa or any other user loaded Harriet Carter's website, its source code told her browser to send a GET request to NaviStone's server in Virginia. *Id.* at 124-25. That server then sent her browser additional code telling it to send her website-interaction data to NaviStone. *Id.* at 125. The district court granted summary judgment to the defendants, reasoning in part that any interception occurred outside of Pennsylvania, at NaviStone's Virginia servers, putting the conduct beyond the WESCA's reach. *Id.* at 126, 130.

The Third Circuit vacated that decision, holding that the lower court had wrongly identified the point of interception as the place where "Popa's electronic communications reached their final destination." *Id.* at 130. Instead, reviewing the WESCA's definition of "intercept" and federal decisions regarding the FWA's identical definition, the court held that

22

electronic communications are "intercepted" at the point where they are routed to a particular

recipient. *Id.* at 130-31. With that established, the court noted that NaviStone's "code

caused certain communications to be sent from the visitor's web browser directly to NaviStone."

*Id.* at 131 (brackets omitted). "Thus when the code—the rerouting device at issue—told Popa's

browser to send communications to NaviStone and those electronic signals were routed to

NaviStone's servers, an interception occurred." *Id.* (footnote omitted). The situs of interception

therefore was the state in which Popa, via her browser, accessed the Harriet Carter website. *Id.*

at 131-32. The case was remanded to determine where that had been. *Id.*

The parties agree that the WESCA applies where an alleged interception occurs in

Pennsylvania. In fact, Defendants argue that the statute applies only in that circumstance. To be

sure, a few lines in *Popa* seem to suggest that the WESCA has a strict geographic limitation. In

framing the issue about the point of interception, the *Popa* court broadly observed:

> Pennsylvania courts have declined to extend the WESCA to cover conduct
> occurring wholly outside the Commonwealth—at least in the context of recording
> telephone conversations. *Larrison v. Larrison*, 750 A.2d 895, 898 (Pa. Super.
> 2000). When a person in New York, for example, tape records a phone call with
> someone in Pennsylvania, the WESCA does not apply because the Commonwealth
> has 'no power to control the activities that occur within a sister state.' *Id.*

*Id.* at 130. From that premise, Defendants argue that Plaintiffs' WESCA claims must fail

because they fail to allege any interception in Pennsylvania.

But a closer review of *Popa* and *Larrison*, the only Pennsylvania case cited by the Third

Circuit, demonstrates that the WESCA may apply even to out-of-state interceptions. In *Larrison,*

the Superior Court of Pennsylvania was asked to determine whether the WESCA or New York's

wiretapping law applied to a telephone conversation taped in New York. *Larrison*, 750 A.2d at

898. There was a conflict between the two laws. Under the WESCA, an all-party consent

statute, the recording was illegally made, whereas under the New York law, a single-party

consent statute, there was no issue. *Id.* Remarking that the matter was a "conflict of law case," the court had to decide which law governed. *Id.* Pennsylvania's choice of law rules, the court observed, dictate "a flexible approach" that "gives the state having the most interest in the question paramount control over the legal issues arising from a particular factual context, thereby allowing the forum to apply the policy of the jurisdiction most intimately concerned with the outcome." *Id.* (citing *Griffith v. United Air Lines, Inc.*, 203 A.2d 796, 805 (Pa. 1964)). It concluded that "New York possessed the greater interest in allowing its citizens to record telephone conversations lawfully with only the consent of the sender or receiver." *Id.*

*Popa* adopted *Larrison*'s choice of law reasoning. Even while making a broad statement about the WESCA's territorial reach, the court later explained that if Virginia was "the sole point of interception" then it "would need to conduct a choice-of-law analysis to determine whether the WESCA should reach this conduct." *Popa*, 52 F.4th at 130. In other words, *Popa* contemplated that the WESCA might still apply to interceptions in Virginia. The court, however, had no opportunity to conduct a choice of law analysis because it would have required knowing where Popa's browser accessed the Harriet Carter website and yet "no source in the record confirm[ed]" where that had been. *Id.* at 131-32.

To summarize: the WESCA can apply in two scenarios. First, as both parties agree, it applies when electronic communications are intercepted in Pennsylvania. Second, even if the interception occurs beyond Pennsylvania, the WESCA still may apply if Pennsylvania is the jurisdiction "most intimately concerned with the outcome of the particular litigation." *Griffith*, 203 A.2d at 805-06 (quotation marks, brackets, and citation omitted).

Here, Plaintiffs fail to plausibly allege that their communications were intercepted in Pennsylvania. They plead that the tracking technologies tell a user's browser to send GET

24

requests to the third-party vendors.  The GET requests then transmit data about how a user interacts with the website.  Those mechanics, *Popa* instructs, allege that a user's information is intercepted from his browser.  Furthermore, even when viewing the allegations in a light most favorable to Plaintiffs, the SAC does not permit an inference that Plaintiffs accessed the Cigna website from Pennsylvania.  No Plaintiff is a Pennsylvania resident.  Nor do any of them explicitly allege accessing the website while in Pennsylvania.  The only possible inference is that Plaintiffs' browsers communicated with Defendants' and the third parties' servers from Plaintiffs' respective states of domicile—none of which is Pennsylvania.[13]

That leaves option two: a choice of law analysis that, at this time, cannot be undertaken based on the current briefing.  Pennsylvania's choice of law analysis proceeds in two steps.  The first is to determine whether a "true conflict" exists between the two state laws.  *Melmark, Inc. v. Schutt ex rel. Schutt*, 206 A.3d 1096, 1104 (Pa. 2019) (citations omitted).  If the laws would produce different outcomes, the second step asks "which state has the most significant relationship to the occurrence and the parties."  *Id.* at 1107.  "The overriding consideration is which state has 'a priority of interest in the application of its rule of law' so as to vindicate the policy interests underlying that law."  *Id.* (quoting *McSwain v. McSwain*, 215 A.2d 677, 682 (Pa. 1966)).  "[S]uch analysis tends to be fact-sensitive" and considers, at a minimum, the parties' state citizenship, the location of the relevant conduct, the location of the harm, and the laws' animating policy concerns, especially those underlying the substantive conflict.  *Id.* at 1107-09.

Here, the choice of law issue is underdeveloped.  Plaintiffs, on the one hand, say that the

---

[13] In their brief in opposition, Plaintiffs suggest that their communications were intercepted at two points: their browsers and "Defendant's infrastructure."  It is not at all clear what Plaintiffs mean by "infrastructure."  They fail to elaborate on the term or cite allegations in the SAC that could shed some light.  But most fundamentally, they fail to reconcile their position that there were multiple interception points with *Popa*'s holding that "*the place* of interception is *the point* at which the signals were routed to NaviStone's servers."  *Popa*, 52 F.4th at 132 (emphasis added).

WESCA should apply because Pennsylvania has a strong interest in regulating the conduct of its corporations—including CCS, which Plaintiffs allege has its principal place of business in Philadelphia.[14]  *See Unisys Fin. Corp. v. U.S. Vision, Inc.*, 630 A.2d 55, 57 (Pa. Super. 1993) ("[T]he role of Pennsylvania in the instant litigation goes beyond that of the forum state to a state which has an interest in the protection of one of the parties, i.e., a corporate entity organized and existing pursuant to its laws.").  On the other hand, Defendants argue that Pennsylvania law should not apply because Plaintiffs' home states—California, Massachusetts, New York, and Ohio—have a greater interest in protecting their citizens' privacy interests.  *See Karnuth v. Rodale, Inc.*, 2005 WL 1683605, at *4 (E.D. Pa. July 18, 2005) (holding that putative class members' home states had a "paramount interest" in applying their respective consumer protection laws).

Neither party, however, has briefed the threshold issue of whether there is even a conflict between the WESCA and the wiretapping statutes of Plaintiffs' home states.  And at step two, the analysis as currently briefed stands in equipoise as to which state has the greatest interest in the litigation's outcome.  It would therefore be premature to dismiss Plaintiffs' WESCA claims on choice of law grounds.[15]  With the advantage of discovery, however, Defendants may renew their argument at a later stage in the litigation.[16]

---

[14] By contrast, Pennsylvania's interest in regulating The Cigna Group is attenuated.  Plaintiffs allege that Cigna is incorporated in Delaware and based in Connecticut.

[15] Defendants also raised an argument against the extraterritorial application of Pennsylvania common law.  This argument has likewise not been sufficiently developed for a decision at this time.

[16] One final point: Plaintiffs' citation to *Danganan v. Guardian Prot. Servs.*, 179 A.3d 9 (Pa. 2018), does not resolve the issue.  That case involved a wholly different statute, Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), and held that non-Pennsylvania residents could sue under it, subject to limiting "legal precepts . . . such as jurisdictional principles and choice-of-law rules."  *Id.* at 17.  Even if the Court accepts Plaintiffs' premise that the UTPCPL and the WESCA are construed similarly, *Danganan* confirms that choice of law principles limit statutory causes of action under Pennsylvania law.

### F.  Plaintiffs Fail to State Claims for Intrusion Upon Seclusion

Plaintiffs claim that Defendants intentionally intruded upon their private affairs by capturing their private, health-related data.  "Intrusion upon seclusion is an intentional intrusion, 'physical or otherwise, upon the solitude or seclusion of another or his private affairs or concerns if the intrusion would be highly offensive to a reasonable person.'"  *Cook v. GameStop, Inc.*, 148 F.4th 153, 160 (3d Cir. 2025) (internal brackets and alteration omitted) (quoting *Kline v. Sec. Guards, Inc.*, 386 F.3d 246, 260 (3d Cir. 2004)).  "The tort may occur by (1) physical intrusion into a place where the plaintiff has secluded himself or herself; (2) use of the defendant's senses to oversee or overhear the plaintiff's private affairs; or (3) some other form of investigation or examination into plaintiff's private concerns."  *Borse v. Piece Goods Shop, Inc.*, 963 F.2d 611, 621 (3d Cir. 1992).

Unlike other privacy torts, "'[t]he intrusion itself makes the defendant subject to liability.'"  *Cook*, 148 F.4th at 160 (quoting Restatement (Second) of Torts § 652B cmt. b (1977)).  "That is because the tort 'consists solely of an intentional interference with the plaintiff's interest in solitude or seclusion, either as to his person or as to his private affairs or concerns,'" and "does not turn on the exposure," "'publication,'" or "'other use of any kind'" of the acquired information.  *Id.* (brackets omitted) (quoting Restatement (Second) of Torts § 652B cmts. a-b (1977)).  Moreover, for the invasion to be actionable, the intrusion must be "substantial and highly offensive to a reasonable person."  *Chicarella v. Passant*, 494 A.2d 1109, 1114 (Pa. Super. 1985) (citing *Harris ex rel. Harris v. Easton Publ'g Co.*, 483 A.2d 1377, 1383-84 (Pa. Super. 1984); and Restatement (Second) of Torts § 652B cmt. d (1977)).

Here, Plaintiffs fail to state a claim for intrusion upon seclusion because, as stated above,

27

Defendants were the intended recipients of Plaintiffs' communications. The SAC underscores that Plaintiffs "entrusted Defendants to protect the private and personal health information of Plaintiffs and members of the putative class," and that Defendants "collect[ed] and manage[d] on behalf of Plaintiffs" their health-related data. In other words, Plaintiffs knew—and relied on the fact—that Defendants had access to their interactions. That is fatal to their claims. "In Pennsylvania, liability for intrusion upon seclusion cannot exist where a defendant legitimately obtains information from a plaintiff." *Steinberg v. CVS Caremark Corp.*, 899 F. Supp.2d 331, 342-43 (E.D. Pa. 2012) (citing *Burger v. Blair Med. Assocs., Inc.*, 964 A.2d 374, 378 (Pa. 2009)). Put differently, "[o]ne cannot intrude when one has permission." *Popa v. Harriet Carter Gifts, Inc.*, 426 F. Supp.3d 108, 121 (W.D. Pa. 2019) (quoting *Jevic v. Coca Cola Bottling Co. of N.Y.*, 1990 WL 109851, at *9 (D.N.J. June 6, 1990)). It would be perverse for Defendants to be liable for acquiring data that was always intended for them.

Instead, it is clear that Plaintiffs seek to hold Defendants accountable for deploying the tracking technologies and diverting their communications to third parties. The alleged intrusion, then, is committed by the third-party vendors, who are not parties to this action. Although a different privacy tort might offer a remedy for an unauthorized disclosure of Plaintiffs' information, intrusion upon seclusion does not. *See Steinberg*, 899 F. Supp.2d at 343 (explaining that a party's receipt of information through legitimate means is nonactionable "even where those facts voluntarily offered are later disclosed to a third party" (citing *Harris*, 483 A.2d at 1383)). Thus, because Plaintiffs cannot state a claim against the intended recipients of their communications, their intrusion upon seclusion claims will be dismissed. *See, e.g.*, *Kurowski v. Rush Sys. for Health*, 659 F. Supp.3d 931, 943-44 (N.D. Ill. 2023) (dismissing an intrusion upon seclusion claim against a hospital system on similar reasoning).

28

Although courts are generally required to "permit a curative amendment" of "a complaint . . . vulnerable to 12(b)(6) dismissal," dismissal with prejudice is appropriate if "amendment would be inequitable or futile." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008). Here, because Plaintiffs' case is predicated on their use of Defendants' website—and by extension, sharing data with Defendants—amendment could not cure the identified deficiency. Accordingly, dismissal of the intrusion upon seclusion claims will be with prejudice.

### G.  Plaintiffs Plausibly Allege Unjust Enrichment Claims

Defendants argue that Plaintiffs fail to state a claim for unjust enrichment because they fail to allege imparting a benefit.  Unjust enrichment is an equitable remedy that permits a party to recover another's "'wrongfully secured or passively received'" benefit where retention of that benefit "'would be unconscionable.'" *See Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 180 (3d Cir. 2008) (quoting *Torchia v. Torchia*, 499 A.2d 581, 582 (Pa. 1985)).  To plead unjust enrichment under Pennsylvania law, a plaintiff must allege that: (1) he conferred a benefit on the defendant; (2) the defendant appreciated that benefit; and, (3) it would be inequitable for the defendant to retain the benefit without payment of value.  *Id.* (citation omitted).  "The application of the doctrine depends on the particular factual circumstances of the case at issue." *Shafer Elec. & Constr. v. Mantia*, 96 A.3d 989, 993 (Pa. 2014) (quotation marks and citation omitted).  The focus of the inquiry "is not on the intention of the parties, but rather on whether the defendant has been unjustly enriched." *Id.* (quotation marks and citation omitted).

Defendants argue that Plaintiffs do not satisfy the first element's requirement of alleging the conferral of a benefit.  Plaintiffs respond that Defendants have inequitably benefited in two ways.  First, they argue that Defendants commoditized their health information for marketing purposes, which was a misuse of that data under Defendants' own policies and federal law.

Second, they argue they paid for insurance coverage that was represented as privacy-protective and HIPAA-compliant when in reality it was neither.  Under this theory, Plaintiffs essentially allege that they overpaid for their insurance premiums, and that it would be unfair for Defendants to retain the portion of their insurance premiums that should have been expended on the promised data privacy and legal compliance.

Defendants have not shown that Plaintiffs fail to state a claim.  The nonbinding authorities cited in their motion are either irrelevant to a motion to dismiss or easily distinguishable given Plaintiffs' commoditization and monetary-benefit theories.  *See Salvitti v. Lascelles*, 669 F. Supp.3d 405, 417 (E.D. Pa. 2023) (granting summary judgment where plaintiffs failed to point to evidence from which they could quantify the benefit conferred upon the defendants); *In re NCB Mgmt. Servs., Inc. Data Breach Litig.*, 748 F. Supp.3d 262, 278-79 (E.D. Pa. 2024) (dismissing an unjust enrichment claim where plaintiffs failed to explain how the defendant appreciably benefited from the mere possession of their personally identifiable information, in contrast to other situations where such information was "valuable" because it had been "commoditize[d]"); *Tignor v. Dollar Energy Fund, Inc.*, 745 F. Supp.3d 189, 206 (W.D. Pa. 2024) (dismissing an unjust enrichment claim because, among other reasons, the plaintiff did not plead that the defendant commoditized her personally identifiable information).  The unjust enrichment claims may therefore proceed.  An appropriate order follows.

BY THE COURT:

S/ WENDY BEETLESTONE

_____

WENDY BEETLESTONE, C.J.

30